# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 22-cr-230** |
| | **:** | |
| **BRIAN JACKSON and** | **:** | |
| | **:** | |
| **ADAM JACKSON,** | **:** | |
| | **:** | |
| Defendants. | **:** | |

## GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION FOR RECONSIDERATION OF THE DETENTION ORDER

On August 26, 2022, the defendant, Brian Jackson, filed a motion to revoke detention order, Dkt. 25, requesting release following the June 9, 2022 detention order issued by U.S. Magistrate Judge Andrew M. Edison in the Southern District of Texas.   Although Brian Jackson is charged with the same crimes as his brother, Adam Jackson, his background, history, and characteristics are distinct and show that detention is warranted in his case.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The government incorporates all facts set forth in the Statement of Facts accompanying the Criminal Complaint.   *See United States v. Brian Jackson*, Case No. 1:22-mj-127.   In short, Brian Jackson traveled to Washington, D.C. with his brother and a friend, and became part of a violent mob on the Lower West Terrace of the U.S. Capitol building on January 6, 2021.   He documented and discussed portions of his day on Facebook.   For example, after he posted a picture of himself and his brother in what appeared to be a Washington, D.C. hotel room, stating that they were enjoying a drink "after the pre rally," others commented, "Stop the steal" and "Go getem guys!"   Brian Jackson responded, "hell yeah it's gonna be epic!!!"   *See* Compl. SOF at 2.

Once at the Capitol, he took multiple videos of the rioters, including videos in which other rioters were hurling objects at the line of police guarding an entry way to the building on the Lower West Terrace.   He took a video of his brother, Adam Jackson, and appeared to state, "Adam got a god-damned shield, stole it from the fucking popo!"   *Id*. at 11.   Finally, he hurled a flagpole at the same line of police.   A review of third-party video, U.S. Capitol Police surveillance video, and body-worn camera video shows that the flagpole likely made contact with officers.[1]   *See* Third-Party Video Clip, uploaded as Exhibit 1; *see also* CCTV Video Clip, uploaded as Exhibit 2; *see also* BWC Video Clip, uploaded as Exhibit 3.[2]   After January 6, 2021, Brian Jackson sent videos of his time at the Capitol over Facebook, and sought to delete evidence of those videos thereafter.   Compl. SOF at 12.

On June 7, 2022, Brian Jackson was arrested pursuant to a Criminal Complaint issued on June 2, 2022.   He was charged with: (1) civil disorder, in violation of 18 U.S.C. § 231(a)(3); (2) assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1); (3) entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); (4) disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); (5) engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4); and (6) act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

After his arrest, the government moved for detention.   The U.S. Probation Office for the

---

1 In reviewing Exhibits 1 through 3, Brian Jackson hurled the flagpole at law enforcement officers approximately eight seconds after his brother, Adam Jackson, hurled a large orange object at the same officers.   Using that timeframe in reviewing BWC Video Clip 1 (Exhibit 3), it appears that the flagpole likely made contact with officers.
2 The government has uploaded all video exhibits referenced herein to a USAfx folder accessible to the Court and defense counsel, entitled "USA v. Brian Jackson – Gov't Exhibits for 09/14/2022 Detention Hearing."

Southern District of Texas prepared a Pretrial Report[3] that same day, recommending that Brian Jackson be held in detention since there was no condition or combination of conditions that could reasonably assure his appearance before the Court and/or the safety of the community. This stands in contrast to the recommendation made by the same office that Brian Jackson's brother be released on a combination of conditions.

On June 9, 2022, U.S. Magistrate Judge Edison conducted a detention hearing in Houston, Texas, for Brian Jackson and his brother.   At the detention hearing, the government provided a proffer that relied on the Criminal Complaint and then provided the testimony of FBI Special Agent Craig Storemski.   The government admitted two video exhibits at the hearing: an excerpt from a second body-worn camera video, *see* BWC Video Clip 2, uploaded as Exhibit 4, and a video from open source, *see* Third-Party Video Clip, uploaded as Exhibit 1.

Magistrate Judge Edison ordered Brian Jackson detained, finding that he was a danger to the community, and that he was unable to fashion conditions of release that he believed Brian Jackson would abide by.   Jackson Det. Hearing Tr., attached as Exhibit 5, at 96-97 ("I have zero confidence based on the evidence that I have heard, that they will abide by [any] restrictions, given their past history, given the past criminal history where they continue to violate the law . . . There is, in my view, a continuing threat to violence.").

Between Brian Jackson's detention hearing on June 9, 2022 and the instant motion for release, a grand jury indicted him on an initial Indictment, *see* Indictment, Dkt. 8, and then a Superseding Indictment.   *See* Superseding Indictment, Dkt. 14.   The Superseding Indictment

---

3 Because this report bears certain restrictions regarding public distribution, the government has uploaded this report to the same USAfx folder referenced in n.1.

added more serious, including charges pertaining to his use of a dangerous and deadly weapon –
the flagpole he hurled at police.   *Id.* (charging violations of 18 U.S.C. § 111(a)(1) and (b)
(assaulting officers using a deadly weapon); 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (entering and
remaining in a restricted building or grounds with a deadly or dangerous weapon); 18 U.S.C.
§ 1752(a)(2) and (b)(1)(A) (disorderly and disruptive conduct in a restricted building or grounds
with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (engaging in physical
violence in a restricted building or grounds with a deadly or dangerous weapon)).

In total, Brian Jackson now faces six charges – five of which are felonies involving the
use of a deadly and dangerous weapon.   He fails to acknowledge the Superseding Indictment
(and its more serious charges) in any portion of his motion for release and appears to incorrectly
premise all of his arguments for release on the now superseded charges contained in the
Complaint and the Indictment.   Def't Mtn for Release, Dkt. 25 at 2-3, 8 ("Mr. Brian Jackson is
charged with 5 counts . . . .").

## II.    LEGAL STANDARD

Under the Bail Reform Act, the government may move for detention if a charged offense
falls under one of the five enumerated categories within 18 U.S.C. § 3142(f)(1)(A) – (E) or if the
defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or
intimidate a juror, as cited within 18 U.S.C. § 3142(f)(2)(A)-(B).   *See also United States v.
Chrestman*, 525 F.Supp.3d 14, 21 (D.D.C. 2021).

Under § 3142(f)(1), a charge under 18 U.S.C. §§ 111(a)(1) and (b) is considered a crime
of violence.   "Crime of violence" is defined in 18 U.S.C. § 3156(a)(4) in part as "(A) an offense
that has as an element of the offense the use, attempted use, or threatened use of physical force

against the person or property of another or (B) any other offense that is a felony and that, by its

nature, involves substantial risk that physical force against the person or property of another may

be used in the course of committing the offense."   A charge under 18 U.S.C. § 111(a)(1) and (b)

falls within the statute.

The government must prove by clear and convincing evidence that "no condition or

combination of conditions will reasonably assure the safety of any other person and the

community."   18 U.S.C. § 3142(f); *United States v. Munchel*, 991 F.3d 1273, 279-80 (D.C. Cir.

2021).

In determining whether there are any conditions or combination of conditions that will

reasonably assure the appearance of the defendant as required and the safety of any person in the

community, the Court considers the following factors: (i) the nature and circumstances of the

offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and

characteristics of the defendant; and (iv) the nature and seriousness of the danger to any person

or the community that would be posed by the defendant's release.   18 U.S.C. § 3142(g).

## III.   ARGUMENT

### A.   Factors Enumerated in 18 U.S.C. § 3142(g)

#### i.   Nature and Circumstances of the Offense

The nature and circumstances of this offense weigh in favor of detention, as this Court

found when weighing this factor, with similar facts, in Brian Jackson's brother's case.   *See* Order,

Dkt. 26 at 8.   In *Chrestman*, Chief Judge Beryl Howell articulated a set of factors for evaluating

the nature and circumstances of offenses committed at the Capitol, and how those factors bear on

detention.   525 F. Supp. 3d 14 at 26-27.   Those factors include whether the defendant: (1) is

charged with felony offenses, or solely with misdemeanors; (2) engaged in prior planning for his criminal conduct before arriving at the Capitol; (3) carried or used a dangerous weapon at the Capitol; (4) coordinated with other participants before, during, or after the riot; (5) assumed a formal or *de facto* leadership role with respect to the riot; and (6) injured, attempted to injure, or threatened injury to others; damaged or attempted to damage property; actively threatened or confronted law enforcement officers; or promoted or celebrated efforts to engage in such conduct.

*Id*.  As the Court noted:

> Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct. These factors measure the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community.

*Id*.

The first factor relates to the severity of the charges.   Brian Jackson is charged with five felonies and one misdemeanor, including, but not limited to, assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b), and interfering with police officers during a civil disturbance, in violation of 18 U.S.C. § 231(a)(3).

In his motion, Brian Jackson first argues that the charges against him are a "combination" of felonies and misdemeanors, where the "evidence for the felonies is . . . weak[]" and concludes that this factor does not therefore weigh in favor of the government.   *See* Def't Mtn for Release, Dkt. 25 at 8.   But Brian Jackson misapprehends the gravity of the offenses he faces, perhaps because his arguments focus on the earlier Criminal Complaint.   Moreover, his suggestion that evidence for those charges is weak is flawed for reasons given below.

Because he is facing five felony charges, with the most serious carrying a maximum prison sentence of 20 years, this factor underscores the seriousness and violence of the offenses.

The second and fourth *Chrestman* factors relate to prior planning and coordination with other rioters.   There is minimal evidence of prior planning and coordination with at least two other people, but this was not extensive.   The fifth factor, relating to leadership, is not implicated here.   As a result, these factors do not weigh toward the seriousness and violence of the offenses.

The third *Chrestman* factor relates to carrying a dangerous weapon.   Brian Jackson is charged with carrying a dangerous weapon: a flagpole.   He used it against police officers, in a manner meant to inflict bodily harm.   *See United States v. Webster,* No. 21-cr-208, Dkt. 99 ("There was ample evidence from which the jury could have concluded that Defendant used the metal flagpole as a 'deadly or dangerous weapon.'"); see also *United States v. Richardson*, No. 21-cr-721, 2022 WL 252034, at *8 (D.D.C. Jan. 27, 2022) (Flagpole used by January 6 defendant to strike law enforcement was a "dangerous weapon").   Although Brian Jackson attempts to minimize this conduct, stating that it is "difficult to tell what is happening," that "it is impossible to tell what exactly is happening," and that "it unclear in those images what is happening," Def't Mtn for Release at 9, the opposite is true.   The images in the Complaint clearly show Brian Jackson hurling a flagpole at law enforcement officers.   *See* Compl. SOF, Images 2, 4-8.   The videos contained in Exhibits 1 through 3 show the same.

Brian Jackson also argues that there is no "indication that the pole made contact and/or injured any officers, or even any shields."   Def't Mtn for Release at 4.   But as Exhibits 1 through 3 show, the flagpole almost certainly made contact with police officers who were in the

entry way to the Capitol building.   And, in any event, what makes an object such as a flagpole a dangerous weapon is the object's potential to cause "serious bodily injury or death" and the defendant's use of the object in that manner.   *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002).   Whether or not the flagpole touched any officer, Brian Jackson's violent conduct, which involved hurling it in a manner that endangered officers, demonstrates that he poses a danger to those around him.

The final *Chrestman* factor considers the defendant's words and movements during the riot.   This factor definitively underscores the seriousness and violence of the conduct in this case, because Brian Jackson attacked law enforcement officers without provocation, using a dangerous weapon.   Brian Jackson makes much of the fact that he "did not make any attempt to enter the U.S. Capitol," but he glosses over the violence he inflicted on the police, and his glorification of his participation in riot, through statements he made on Facebook.   Even at the riot, he appeared to pump his fist in celebration after attacking law enforcement officers, *see* Complaint SOF at Image 15.   This evidence indicates Brian Jackson's disregard for the rule of law—an important element in this inquiry.

### ii.        Weight of the Evidence Against the Defendant

This factor weighs in favor of detention.   The video evidence alone against Brian Jackson includes BWC footage, U.S. Capitol Police surveillance video footage, and videos taken from the public on January 6, 2021, as well as the videos on his own Facebook account.   The videos not only depict Brian Jackson engaging in violence, but also provide helpful identification of him, in that he is often pictured with his brother and he is wearing distinctive clothing.   His

Facebook messages and videos contain multiple admissions that he was at the Capitol on January 6, and that he participated in and celebrated the riot.

In multiple instances, Brian Jackson admitted to destroying evidence on his Facebook account, which shows consciousness of guilt.   He sent messages to others on Facebook, asking them to delete videos and messages he had sent, and admitting that he had "posted a bunch pics [he] shouldn't have" from January 6.   Compl. SOF at 12.   He also appeared to have deleted one of his Facebook accounts at some point after January 6.   *Id*.

Other evidence supports the charges.   For example, his friend's Facebook account contained photos of Brian Jackson at the Capitol on January 6.   And airline records show that he flew from Texas to the Washington, DC area around January 6.

### iii.        History and Characteristics of the Defendant

This factor also weighs in favor of detention.   In evaluating his "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," 18 U.S.C. § 3142(g), Brian Jackson's personal history and characteristics do not reflect stability or an ability to abide by the law.

#### 1.        *Criminal history and failure to appear or comply*

Brian Jackson's criminal history is more serious than his brother's and includes more recent incidents of violence.   At age 21, Brian Jackson was arrested and convicted on two separate incidents: once for driving with a suspended license, for which he received a sentence of 10 days' confinement, and another time for a "Terroristic Threat."   For the latter conviction, he

was sentenced to "180 days deferred adjudication supervision," but he failed to successfully complete the terms of the adjudicated supervision when he failed to report.   As a result, his deferred adjudication was revoked, and he was sentenced to 10 days' confinement on that charge.

Just one year later, at age 22, he was arrested for aggravated assault with a deadly weapon and convicted of a lesser misdemeanor charge thereafter.   This offense involved a drive-by shooting that he participated in with his brother.   He was sentenced to 90 days' confinement on that charge.

Between the ages of 22 and 30, Brian Jackson was arrested on an array of other charges, including assault causing bodily injury and driving while intoxicated.   In 2005, at the age of 30, he was convicted of two felonies: burglary of a habitation and aggravated robbery.   The details of this conviction are contained in a report obtained from the Harris County, Texas, District Attorney's Office.   *See* Harris County DA Report, attached as Exhibit 6.   In summary, the complainant was in his Houston apartment armed with a Glock when Brian Jackson and two other men kicked in his apartment door and entered.   They pushed the complainant to the floor and Brian Jackson punched him in the face.   One of the other men took the complainant's gun, and while Brian Jackson held the complainant to the floor, the third man pointed the complainant's gun at the complainant and demanded the code for a safe in the room.   The three men took $300 in cash, as well as the gun, and left thereafter.   For these two felonies, Brian Jackson was sentenced to 15 years' confinement.

In 2019, likely immediately after being released from his 15-year sentence on the burglary and aggravated robbery, he was arrested for assault causing bodily injury to a family

member and resisting arrest, search or transport.   A report from the Santa Fe Police Department indicates that his ex-girlfriend called the police complaining that Brian Jackson had slammed her head into the ground.   *See* Santa Fe Police Department Report, attached as Exhibit 7.   When police arrived on the scene, his ex-girlfriend had blood on the front of her shirt as well as on her neck, and blood coming from a cut on her head.   Brian Jackson denied the allegation, but then refused to comply with police orders to get into the police vehicle.   For resisting arrest, search, or transport, he was convicted and sentenced to 192 days' confinement.

This long-running criminal history – combined with his criminal conduct on January 6, 2021 – shows that Brian Jackson has acted violently on numerous occasions in the past and recently.   Even after January 6, 2021, he knowingly engaged in obstructive conduct.   His Facebook records indicate that he deleted videos and posts he had created relating to January 6, and even apparently deleted a Facebook account.   *See* Compl. SOF at 12 ("I took my other fb page down because of my trip to Dec [sic] on 6th posted a bunch pics I shouldn't have."); *see also* Facebook Messages Excerpt #1 at 3, attached as Exhibit 8 (Brian Jackson to another person after "unsending" multiple messages: "Delete delete delete 😆😆").

There is also evidence that Brian Jackson was not fully forthcoming with the U.S. Probation Office for the Southern District of Texas when he was interviewed upon arrest on June 7, 2022.   During that interview, Brian Jackson stated that there were no firearms in the home he lived in with his fiancée.   His fiancée contradicted him when she independently told U.S. Probation that she did keep a gun in their shared home.   His Facebook messages with her confirm that he knew she had a gun.   *See* Facebook Messages Excerpt #2, attached as Exhibit 9 ("Good thing I'll put ypur gun back now 🤣🤣.").

## 2.      *Character and past conduct*

Brian Jackson's history also includes gang affiliation and white supremacist beliefs.   He

self-reported that he was previously part of a gang known as the White Knights, Jackson Det.

Hearing Tr., uploaded as Exhibit 5, at 47, and photos of him on his Facebook account show that

he bears tattoos of a swastika, Adolf Hitler's signature, a drawing of a knight with "WK" on his

back, and other symbols that are associated with white supremacy.   *See* Facebook Photos

Excerpt, attached as Exhibit 10.   Another photo from Facebook shows Brian Jackson with a

group of men, standing in front of a "White Knights" flag, with a message indicating that he used

to be associated with the group.   *Id*.

On January 6, at the Capitol, Brian Jackson used a hand symbol that is sometimes

associated with white supremacy.   *See* Compl. SOF at 7, Image 8.   If viewed in isolation, this

gesture might not be corroborative of any particular view or intent.   But, coupled with Brian

Jackson's history and other statements in relation to January 6, that evidence indicates that he

was espousing white supremacist views on January 6.   For example, on Facebook, just three

days after the riot, when someone asked him about whether he got "into any fights up there"

while in Washington, D.C., he responded affirmatively and specifically referred to people he had

"chased . . . on the streets" by using the n-word; he also added that it was "nothing but [n-word]

there even all the cops are black fucking crazy. . . ."   Compl. SOF at 12.   In the same

conversation thread, the other person stated, "To far north for me n my southern ass n fuck them

giga boos white man going to have take this great nation back over."   Brian Jackson responded,

"It's fucking nasty there nothing but homeless [n-word] camping out on the streets begging for

money.   The north sucks big [n-word] dick."   *See* Facebook Messages Excerpt #1 at 2, attached
as Exhibit 8.

These statements and his past gang membership are evidence of his personal history and
characteristics.   They are relevant to this Court's determination of how Brian Jackson views and
treats other members of the community.

### 3.   *Employment and financial resources*

Brian Jackson indicates that he was employed for a year before his arrest.   Def't Mtn for
Release at 13; *see also* Affidavit, Dkt. 25-1.   He argues that he should be released so that he can
provide financially for his fiancée and her father.   But he has not established that he would be
able to continue on in that work upon release, and therefore it is unclear what, if any, ability he
would have to support these people while living in his fiancée's father's house rent-free.   In
addition, given that both his fiancée and her father indicate that they are under "crushing"
financial strain, *see* Affidavits, Dkt. 25-2 and 25-3, they do not appear able to provide a stable tie
to the community if Brian Jackson were to return to their home upon release.

### iv.   Nature and Seriousness of the Danger Posed by the Defendant's Release

This factor weighs in favor of detention.   Brian Jackson has demonstrated, through his
criminal history, that he has been willing to break the law and hurt other people.   After January
6, it is clear from his Facebook messages that he had no remorse over assaulting police officers
while he was there.   And given the statements he made in relation to January 6 (both in hand
gestures and messages on Facebook), it is fair to assume a connection between his violent
conduct on that day and the white supremacist views connected with multiple of his tattoos and

his previous gang affiliation.   In other words, Brian Jackson has connected his personal views to violence.

For example, Brian Jackson stated that he viewed his conduct on January 6 as the beginning of a war—an indication that he views the conflict that fueled his conduct as ongoing. *See* Facebook Messages Excerpt #1 at 1, attached as Exhibit 8 (When someone said, "Shits get reals n we get ready to go to civil war bring your family over here have us a lil compound or something set up out here," Brian Jackson responded, "True that I mean after all I tbink we started the beginning of a revolution.").

Although the government is unaware of Brian Jackson being arrested between January 6, 2021 and this arrest on June 2022, he did not appear to be living a completely peaceable life in that timeframe, either.   In an exchange with his fiancée on Facebook, she indicated that he destroyed some of her property in anger, and his response, while remorseful, blamed his violent conduct on steroid usage.   *See* Facebook Messages Excerpt #2, attached as Exhibit 9 ("I should've never let my anger out on you I know the steroids play a big role in my anger it's not the person I am.").   His communications with his fiancée, and with others, indicate that his life after January 6 was not necessarily one of stability.

While each detention determination is a fact-bound inquiry that must be made individually, *United States v. Khater*, 856 Fed. Appx. 322, 323 (D.C. Cir. July 26, 2021), the D.C. Circuit in *Munchel* notably drew a distinction between violent and non-violent participants in the Capitol riots, with the former being in a "different category of dangerousness."   991 F.3d at 1284.   In fact, the court in *Munchel* specifically named those who assaulted police officers as falling into the category of elevated dangerousness. *Id.*   This Court and other courts in this

14

district have made the same observation.   *See United States v. Fairlamb*, No. 1:21-CR-120-RCL, 2021 WL 1614821, at *5 (D.D.C. Apr. 26, 2021) ("Indeed, if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does.").   The defendant's actions demonstrated "a willingness to use violence—even against law enforcement—to achieve his political aims" indeed, he "sought out conflict with law enforcement by making his way to the front lines," then took actions that "were intended to injure law enforcement officers."   *United States v. Fitzsimons*, No. 21-cr-158, 21 WL 4355411, at *7 (D.D.C. September 24, 2021).   "Such egregious conduct reflects the depths of his disregard for the safety of others, for our democratic institutions, and for the rule of law."   *Id.* (internal citations omitted).

Jackson poses a danger to the community based on his violent acts at the Capitol, his violent criminal history, and his personal history and characteristics.   Both the Southern District of Texas U.S. Probation Office as well as Magistrate Judge Edison found that no condition or combination of conditions of release would assure the safety of the community.   There is no reason that this Court should deviate from those findings, given the evidence of Brian Jackson's past and recent violent behavior.

As a final note, the Court and Brian Jackson have argued that the government's timing in charging the Jacksons is evidence that they are not dangerous.   *See* Order, Dkt. 26 at 11 ("the government waited over a year to detain someone it claims is dangerous—unless, perhaps, that is not the case.")[4]; *see also* Def't Mtn for Release at 15.   Respectfully, that notion incorrectly

---

4  The Court, in its order granting Adam Jackson's release, also gives weight to "the fact that the government has not sought detention for January 6 defendants who have been charged with similarly assaultive conduct on officers." Order, Dkt. 26 at 12. Of the three cases cited by the Court, only one – *United States v. Palmer*, No. 21-cr-328 (D.D.C.) involved a "crime of violence" under the Bail Reform Act. Here, both Brian and Adam Jackson were

presumes that probable cause to charge a defendant with multiple crimes exists upon the

identification of a video of the defendant or the receipt of an anonymous tip regarding the

defendant.   *Id*.   Even assuming that these conclusions regarding the amount of evidence

appropriate for probable cause were correct, it is common for federal investigations, even of

individuals for whom the Department of Justice quickly obtains probable cause of a crime, to

take many months (and even years in some cases) before arrest or indictment.   In many such

cases, pretrial detention is not only ordered, but presumed under the statute.   18 U.S.C.

§ 3142(e)(3).

     More to the point, the government's timing in seeking charges and the government's

decisions to seek or not seek detention in other cases are not part of the Bail Reform Act's

analytical framework.   And these two issues, taken on their face, do not bear on whether Brian

Jackson poses a threat to the safety of others.

---

charged with a crime of violence.

IV.     **CONCLUSION**

For the reasons stated herein, the United States respectfully requests that the Court deny

Brian Jackson's motion for revocation of the detention order entered in the Southern District of

Texas.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:        /s/
CINDY J. CHO
Assistant United States Attorney
NY BAR #4751053
601 D Street NW
Washington, DC 20530
(317) 246-0107
Cindy.Cho@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2022, I caused a copy of the foregoing to be served on counsel of record via electronic filing.

*/s/ Cindy J. Cho*
Cindy J. Cho
Assistant United States Attorney

18