**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) CRIM NO. 22-CR-00230-RC |
| BRIAN JACKSON, | ) Judge: Contreras |
| | ) |
| | ) |
| Defendant. | ) |

**REPLY TO THE GOVERNMENT'S OPPOSITION TO
DEFENDANT BRIAN JACKSON'S
MOTION TO REVOKE DETENTION ORDER**

COMES NOW defendant Brian Jackson, through counsel, and responds to the government's Opposition to Defendant Brian Jackson's Motion to Revoke Detention Order (hereinafter "Opposition"), stating as follows:

The government's arguments for detention rely on points that are based upon suggestions and not facts of the evidence at hand. It attempts to impugn Brian Jackson through the actions of others occurring at the U.S. Capitol on January 6th by using exaggeration and focusing on the actions of their acts others rather than the actions of Brian Jackson himself. Further, the government seeks to suggest that Mr. Brian Jackson is somehow a danger to the community based upon his protected speech under the First Amendment, while virtually ignoring the fact that Mr. Jackson remained in the community working hard and supporting his family

1

in the community every day after January 6ᵗʰ, 2021. Perhaps most significantly, the government cannot provide any explanation to show that from January 7, 2021, to June 7, 2021, Mr. Jackson did anything to show he was a danger to the community. Nor can they show that he did anything illegal or improper that would show that he somehow was doing something other than working daily and/or supporting his family, ailing parents, and community   In short, the court can and should release Mr. Jackson with release conditions that would assure the safety of the community and Mr. Jackson's return to court rather than preventively detaining him.

1.      Mr. Jackson does not dispute that he travelled to Washington, D.C. to attend the "Stop the Steal" rally. There is no indication that Mr. Jackson had any plan to commit any violent action on their part. The only thing that the government points to is Mr. Jackson posting a picture of him and his friends drinking in a Washington, DC hotel room, clearly not at the Capitol. His only comment of "hell yeah it's gonna be epic" were made in reference to any violent comments, but rather individuals who agreed with the reason for the rally: to "stop the steal." All these comments are clearly nonviolent and within Mr. Jackson's First Amendment rights. There is no evidence that Brian Jackson had planned to go to the U.S. Capitol that day. There is not even any evidence that Brian Jackson had any sort of item

resembling a flagpole with him, which is the item he is alleged to have thrown. Accordingly, the government cannot even suggest that the item he allegedly committed an assault with was somehow planned or premeditated. The government uses terms to describe the group outside the Capitol as a "violent mob," attempting to group the actions of others who were present and unfairly attributing their action and/or violence on Brian Jackson, when it simply is not the case that Brian Jackson was violent or part of a mob.

2.      While at the Capitol, the government seems to suggest that Brian Jackson attempted to suggest that he was a more active participant in the event, however, the best evidence that the government can provide is Brian Jackson *watching* and passively filming the actions of others and reporting the action he was seeing at the time. Nor at any time did Brian Jackson can the government show that he encouraged the actions of others, including the people he was with. In short, except for the allegedly thrown item, discussed in more detail in ¶ 3 below, Brian Jackson took no actions against the U.S. Capitol Police or, more importantly, was making any attempt to enter it or help others enter it.

3.      As the court is now well aware, the entire basis of the government's charges essentially stems from one action: Brian Jackson taking a wooden flagpole and throwing it in the direction of U.S. Capitol police officers that were fully armed

and fully protected with helmets and shields. The government states that the video evidence "clearly" shows Mr. Jackson committing the act. The government makes this generalized statement as proceeds to make it as fact when it is far from the truth and is factually in dispute and far from clear. Based upon the videos, it is not clear that Mr. Jackson is the individual who through the object. Even assuming, *arguendo*, that it was Mr. Jackson, the government, in their Opposition, cannot even argue that anyone was injured. Indeed, they cannot, even with all the video evidence they have provided, suggest that the flagpole even made contact with any officer. *See* Opposition at 2 ("… the flagpole *likely* made contact with officers). Accordingly, Brian Jackson's alleged offense was throwing an item in the direction of police officers fully armed and protected by riot gear, including helmets, goggles, and riot shields. Furthermore, if the government's suggestion of events in footnote 1 is to be accepted as the event, it appears that the item thrown did not have any sort of pointed edge to it, flew directly over the heads of the officers, and landed behind the officers. In fact, the defense avers that there was not even any reaction or flinch from any of the police officers, clearly supporting that the alleged item thrown had any effect upon the officers. As this Honorable Court can see, there was a multitude of things thrown in the direction of the officers, many of which actually made contacts with the officers and were much more "dangerous" than a thin

flagpole thrown over the heads of the officer. Accordingly, to suggest that Mr. Jackson should somehow be detained over this one action, even standing on its own, is incongruous.

4.      Furthermore, the government's suggestion that the item was a "dangerous weapon" ignores past precedent, even in relation to January 6th cases. If we are to believe the government's suggestions of their version of events, the item thrown in the direction of the officers was a wooden[1] flagpole above the heads of the officers. In order for there to be a conviction, the government needs to determine whether the item was used in a that is likely to endanger life or inflict great bodily harm. *See* <u>United States v. Klein</u>, 533 F. Supp. 3d 1, 12 n.6 (D.D.C. 2021). In fact, the court has determined that  "a 'deadly or dangerous weapon' means 'any object which, as used or attempted to be used, may endanger the life of or inflict great bodily harm on a person." <u>United States v. Bullock</u>, 970 F.3d at 215. "A defendant who acts 'forcibly' using a deadly or dangerous weapon under § 111(b) must have used force by making physical contact with the federal [officer], or at least threatened the [officer], with an object that, as used, is capable of causing

---

1 It is difficult to tell what the item allegedly thrown was made of. However, it appears to be a thin long item with a flag attached to it. Given the appearance and flight of the object, it is light and something with very little weight. It would also be rare to see such distance made with an object if it were made of some harder object such as metal. Accordingly, the court can use its common sense to presume the item was a wooden flagpole.

great bodily harm." <u>United States v. Klein</u>, 533 F.Supp. 3d at 10. (quoting <u>United States v. Taylor</u>, 848 F.3d at 476, 494 (1st Cir. 2017)). To suggest that a simple wooden flagpole thrown in the direction of fully protected police officers in full riot gear at a distance was a) a deadly or dangerous weapon; b) had enough force to be considered to be "forcibly" used; or c) could cause great bodily harm is simply absurd.

5.      In addition, to the arguments made previously, Mr. Jackson provides additional letters of support of him which Mr. Jackson2 adopts by reference herein. These are letters that all speak to Mr. Jackson's character as a family man who takes care of his children as well as his parents who are at an advanced age. Several speak to his giving nature to help others. Many are from people who have known Mr. Jackson from an early age. Several of them speak to the changes from Mr. Jackson and the efforts he has made to improve himself. Below is a brief summary of some of the highlights of each letter, listed below in alphabetical order:

        A. Attached as Exhibit A is a letter from Michael Alford, a next-door

            neighbor to Mr. Brian Jackson's father, Jim Jackson. He describes

            Mr. Jackson as "an honest and a generous person" who has seen

_____

2 It should be noted that the defendant, Brian Scott Jackson, goes by the names of both "Brian" and "Scott."

Brian helping other people in need, using his electrician skills without charging them for his labors. He confirms that Brian Jackson has had the same job through the electrical union, and that he works with his father as well.

B. Attached as Exhibit B is a letter from friend April Barnett, who has known Mr. Jackson since childhood and who is like a brother to her. She explains that he is "a good hearted person and was there" when her father passed. She also describes him as a family man who loves his children and grandchildren, and he has made mistakes but has "worked hard to make a better life for him and his family."

C. Attached as Exhibit C is a letter from Alyssa Collier, Mr. Jackson's niece. Ms. Collier indicates that he is a "big family man" with 5 children, the youngest which is 6 months old. She describes him as being "very kind and caring and is very patriotic" and does not believe he is a risk or danger to the community.

D. Attached as Exhibit D is a letter from Bob Faulk, who works with the homeless and underserved in Katy, Texas, where Brian Jackson resides. He describes how in the past Mr. Jackson volunteered to replace an electrical panel for an elderly woman and donated $700 in parts, not to mention his volunteered labor. Mr. Faulk describes that Mr. Jackson "made some poor decisions in the past but he seems to be working hard to be a different man."

E. Attached as Exhibit E is a letter from Kathy and Lindsay Fraser, friends of Brian Jackson and his family. They indicate he is a "very polite and personable young man" with a "positive outlook." They have never seen him angry or "say anything unkind about anyone" and he "does not talk about politics."

F. Attached as Exhibit F is a letter from Haley Hance, Brian Jackson's niece. She states her uncle Brian Jackson "is someone who has done nothing but be there for his family, no matter what." She states he is not a danger to society. He is a father, brother, uncle, son, grandfather, and so much more.

8

G. Attached as Exhibit G is a letter from Adam Jackson, Jr., Brian Jackson's nephew. In the letter, Adam refers to his uncle as "always being there for my family and friends." Brian also is described a nonviolent in that "[Brian] has never threatened or harmed me ever, in fact it's been the complete opposite."

H. Attached as Exhibit H is a letter from James and Nedra Jackson, Mr. Brian Jackson's parents. They state that Mr. Jackson has been their "mainstay for years and has helped run our company, taken us to doctors [sic] appointments and helped run our household as we are elderly and in poor health." As for his work efforts, they explain that "Brian goes to work every day with a positive attitude, and, as "the face of our company… he is very well liked with the customers." As referenced in the letter from Aim High Electronics, attached as Exhibit I, Mr. Jackson has an immediate job opportunity to return as part of Aim High Electric upon release.

I.  Attached as Exhibit J is a letter from Sarah Jackson, Brian Jackson's

daughter. She discusses how he is a family man, spending most of

the time with his family. She indicates that his daily routine involves

going to work every day to his fiancée or to take care of his elderly

parents. She also discusses how he helps strangers and that their

family is not complete without him, particularly since he was in the

process of planning his wedding which was to have happened a

month after he had been arrested.

J.  Attached as Exhibit K is a letter from Khrysten Oliveri, a friend of

the family. She acknowledges that Mr. Jackson "has made bad

decisions in the past, but he has worked hard to change his life

around." She notes he "works a full time job, and contributes to

society, and that "he has a good family, that need him home."

K. Attached as Exhibit L is a letter from a friend Bruce Rankin. He

knows Mr. Jackson from his volunteering to help the underserved in

his community. He notes that while he does not know "about his

past, I only know about the man is today and in my opinion he is a

fine man with morals and values" that are not seen every day.

L. Attached as Exhibit M is a letter from Charlie Vasek, a neighbor of

his parents. He describes Brian Jackson as "a very hard worker & has

helped his father quite often in the electrical craft." Mr. Vasek adds

that he has never heard him disrespecting anyone. He adds that while

"Scott is a very strong Conservative & Republican but has never

been heard by us defaming or degrading our Country or

Government."

6.      Based upon these multiple letters, the court can take into

consideration various facts in concluding that Brian Jackson should not be

preventively detained. First, if he is released, Mr. Jackson has an immediate job

that he can return to work at Aim High Electronics, where he has previously

worked with his father. Furthermore, it is expected that Mr. Jackson will be able to

return to a job as an electrician through his union, using the same Local Union that

he was a member of at the time of his arrest. Second, Mr. Jackson has the ability to

return to a stable life with a panoply of people who are there to support him and

help him return to the life that he has lived since January 7, 2021: one of making a living, paying his taxes, raising his family, helping his parents, and volunteering his skills with the community. Accordingly, while he does have a criminal record, the fact that he has been respectful of the law in the recent pass shows that Mr. Jackson can be trusted not to be a danger to the community.

7.      The government takes issue with the deletion of videos as an action that the court should consider in order to detain Mr. Jackson. There is simply no reason to do so. Brian Jackson was under no obligation to keep the videos. As we have obviously pointed out, the government made no effort to have contact or arrest him prior to June of 2022. His choice to delete them was not in any way destruction of evidence on his part, as he did not know he was facing any potential criminal charges. His deletion and making the statement that "he shouldn't have" posted them can just as easily be seen as being responsible and stopping what some would see of glorification of the improper acts of other when it was not appropriate. There are things that we all do that we may not wish to display to the world, but they do not rise to the level of crime by law. For the government to assign motives and intent based on such manufactured outrage and flimsy evidence shows the desperation to indict and convict.

8.      Perhaps most telling in the government's Opposition is their inability

to give any reasonable explanation as to why the government did not think that

they were a "danger to the community" for close to 18 months. They do not

dispute that they knew the names and addresses of Brian Jackson for over a year.

Upon reviewing the discovery and returns on search warrant information, it

appears that all the information that the government needed to charge Brian

Jackson has been available to them for approximately one year. Indeed, the

government also fails to mention that they had conducted surveillance on multiple

occasions of both Brian and Adam Jackson and their respective families. The

government discovery provides multiple pictures (presumably taken by FBI

agents) of Brian Jackson, his fiancée, his car, and his home. At no time do they

show Mr. Jackson doing anything improper or illegal (despite not being aware that

he was being watched by FBI agents). Yet despite the government's claim of

dangerousness, they are unable to provide any explanation of why the government

allowed Mr. Jackson to remain in the community despite him being located and

having no obstruction to being arrested.

9.      The government has indicated that Mr. Jackson must somehow be a

threat because of certain comments he made as well as tattoos on his body and his

*previous* affiliations with white supremacist groups. This is simply not true, and it

is the government simply seeking to sway the court by suggesting that his First

Amendment beliefs make him a danger to the community and should be a factor to

be considered. First, it should be noted that Mr. Jackson has denounced his

membership or any alliances with any White Knights. As the government

indicated, he *used* to be a member. The tattoos were acquired in prison during his

15-year incarceration for a crime for which Mr. Jackson has paid his debt in full in

prison. Mr. Jackson joined the gang to ensure his survival and has long since

denounced white supremacist racist views in public and in his private conducts.

Part of what led to his release on parole in the burglary matter was his renunciation

of the White Knights and their beliefs, as well as good behavior. While he still has

these tattoos, the only reason they remain on his body is due to cost prohibition.

Mr. Jackson has looked into tattoo removal, and he has been told it will cost

several thousands of dollars in order to remove the tattoos he has, which he

currently cannot afford. Accordingly, Mr. Jackson's body, unfortunately, is

covered with reminders of the sins of his past, and while his preference would be

for those not to exist, he at this time cannot afford to rectify it. In short, Mr.

Jackson wants to remove his tattoos, just like the beliefs, but he simply cannot

financially. As to Mr. Jackson's use of derogatory terms in Facebook messages

related to the January 6th events, this should not be a factor for several reasons.[3]

While he has denounced racism in denouncing his affiliation with the White

Knights, his use of the terminology is not *per se* a racist term, as it is used in

popular culture and is not entirely used in always negative connotation. It is not

necessarily racist.[4]  Even if it is, it is protected speech under the First Amendment,

however offensive. Further. cuss words and derogatory remarks made in general

and not specific against a particular person, however offensive, is protected speech

and not a crime and should not be a factor for detention. His use of the term,

however unacceptable to others, is protected under the First Amendment.

10.     The government, in their opposition, state, "Other evidence supports

the charges," indicating photos of Mr. Jackson at the Capitol and airline

reservations. Opposition at 9. This is simply a red herring on the part of the

government. This "other evidence" goes to provide evidentiary support of actions

Mr. Jackson took that are not illegal, as it is not illegal to have been on U.S.

Capitol grounds or fly to Washington, DC. This "other evidence" should be

disregarded as simply needless rhetoric.

---

3 It should also be noted that the same messages that the government references also show that Mr. Jackson had no desire to return to the District of Columbia (and he did not), which further supports the fact that Mr. Jackson is not a danger to the community.

4 *See, e.g.," Rap's Embrace of 'Nigger' Fires Bitter Debate," New York Times, Jan. 24, 1993, available at* *https://www.nytimes.com/1993/01/24/nyregion/rap-s-embrace-of-nigger-fires-bitter-debate.html*

11.     Finally, all the charges in the indictment are yet to be proven in a court of law and, should this matter go to trial, the defense will challenge every single one. Mr. Jackson has already proven through his actions for almost 18 months after the event that Mr. Jackson can and will be a law-abiding citizen. Given the charges he is facing, he has all the incentive to remain a law-abiding citizen between now and the time of his trial. We need Mr. Jackson freed from punitive incarceration pretrial detention, particularly when he has shown his ability to operate appropriately in society, to assist in his own defense.

WHEREFORE, for the reasons explained above, and in the original Motion to Revoke, the defense respectfully requests that this court revoke the detention order issued by the Texas Magistrate of June 9, 2022, and that the court place Mr. Jackson on personal recognizance or, alternatively, with release conditions that will satisfy the court to assure the court with the safety of the community.

Respectfully submitted,

BRIAN JACKSON
By Counsel


 /s/ John L. Machado
John L. Machado, Esq.
Bar No. 449961
Attorney for Brian Jackson
503 D Street, N.W., Suite 310
Washington, DC 20001
Telephone: (703) 989-0840
E-mail: johnlmachado@gmail.com


## Certificate of Service

I hereby certify that a true copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system this 20th day of September, 2022, which will send a notification of such filing (NEF) to the following to all counsel of record.


    /s/John L. Machado
 John L. Machado, Esq.
 Bar Number 449961
 Attorney for Brian Jackson
 Law Office of John Machado
 503 D Street NW, Suite 310
 Washington, D.C. 20001
 Telephone (703)989-0840
Email: johnlmachado@gmail.com

17