**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 22-230 (RC) |
| | : | |
| BRIAN SCOTT JACKSON, | : | Re Document No.:   25 |
| | : | |
| Defendant. | : | |

**ORDER**

**DENYING DEFENDANT'S MOTION TO REVOKE DETENTION ORDER**

**I.   INTRODUCTION**

Defendant Brian Jackson was one of the hundreds of people who stormed the Capitol to stop Congress from certifying the results of the 2020 presidential election. Video footage shows that on January 6, 2021, Jackson was near the front of the crowd facing a line of officers in the tunnel at the Lower West Terrace. Videos show that Jackson ran up the flight of stairs leading up to the tunnel and hurled a flagpole with an American flag at the line of officers. Jackson was arrested on June 7, 2022. Following a detention hearing before Magistrate Judge Andrew Edison of the U.S. District Court for the Southern District of Texas, Jackson was ordered detained pending trial. Jackson now asks the Court to revoke that detention order and release him. For the reasons described below, the Court will deny the motion.

**II.   BACKGROUND[1]**

Brian Jackson participated in the storming of the Capitol with his codefendant brother, Adam Jackson. Photos from Facebook show that on January 6, 2021, Jackson and his brother

---

[1] This background is drawn from the government's charging instruments, the parties' briefing, and the exhibits tendered to the Court in support of each party's motion. It does not represent the Court's findings of fact on the merits of the case.

attended the "Stop the Steal" rally and later on went to the Capitol building to take part in the riot. Compl. at 2, ECF No. 1-1.

On the Capitol grounds, Jackson can be seen wearing a black Harley-Davidson sweatshirt with a hood, a red hat that says "Trump 45th President," and a blue flag tied around his neck which formed a cape. *Id.* at 4–6. Jackson eventually made his way near the front of the crowd, where videos show that he ran up the flight of stairs leading up to the tunnel and hurled a flagpole with an American flag at the line of officers. *See* Gov't Ex. 1 at 00:11–00:15; Gov't Ex. 2 at 01:46–01:50.[2] The flagpole sailed past the first few rows of officers and it is unclear from the videos whether it made contact with any officer inside the tunnel.

On June 7, 2022, Jackson was arrested. *See* Arrest Warrant, ECF No. 5. He was charged with: (1) civil disorder, in violation of 18 U.S.C. § 231(a)(3); (2) assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1); (3) entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); (4) disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); (5) engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4); and (6) act of physical violence in the Capitol grounds or buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). *See* Indictment, ECF No. 8. A superseding indictment followed with additional charges against Jackson. *See* Superseding Indictment, ECF No. 14 (charging violations of 18 U.S.C. § 111(a)(1) and (b) (assaulting officers using a deadly weapon); 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (entering and remaining in a restricted building or grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (disorderly and

---

[2] Exhibits labeled "Gov't Ex. __" are located in an electronic folder that the government shared with Jackson and the Court. Exhibits labeled "Ex. __ to Opp'n" are attached to the government's Opposition.

2

disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon)).

After Jackson's arrest, the government moved for his detention. On June 9, 2022, U.S. Magistrate Judge Edison conducted a detention hearing in Houston, Texas, for both Jackson and his codefendant brother, Adam. *See* Gov't Ex. 5. Judge Edison ordered Jackson detained on the basis that he was a danger to the community and that no conditions of release would assure the safety of the community. *Id.* at 96–97. Jackson now moves to revoke this detention order. ECF No. 25. The government opposes his release, ECF No. 28, and Jackson has filed a reply, ECF No. 32. The Court held a hearing on the matter. *See* Min. Entry (Sept. 26, 2022). The motion is now ripe for decision.

### III. LEGAL STANDARD

When a magistrate judge detains a person pending trial, "the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The D.C. Circuit has "not squarely decided" what the standard of review should be for such proceedings. *See United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021). But every circuit to address the issue has held that a district court's review of a magistrate's detention order is *de novo*. *See United States v. Chrestman*, 525 F. Supp. 3d 14, 23 & n.5 (D.D.C. 2021) (collecting cases). Neither party argues otherwise. Accordingly, the Court will review the detention order *de novo*.

### IV. ANALYSIS

The Bail Reform Act permits the detention of a defendant awaiting trial only in "carefully defined circumstances." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). For a

3

defendant to qualify for pretrial detention, his case must "involve[]" an offense that falls into one of five enumerated categories, 18 U.S.C. § 3142(f)(1), or pose a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, *id.* § 3142(f)(2)(A)–(B). The court "shall order the detention" of a qualifying defendant if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(e)(1). In other words, the court must ask "whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). Here, the government only contends that Jackson is a danger to the community.

Jackson is eligible for pretrial detention. One kind of offense that qualifies a defendant for pretrial detention is a crime of violence. 18 U.S.C. § 3142(f)(1)(A). A crime of violence includes "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 3156(a)(4)(A). Among other offenses, Jackson is charged with assaulting, resisting, or impeding federal officers by using a flagpole in violation of 18 U.S.C. § 111(b). *See* Superseding Indictment (Count 2). Because that offense is "categorically a crime of violence," Jackson is eligible for pretrial detention. *See United States v. Quaglin*, 851 F. App'x 218, 218 (D.C. Cir. 2021); *see also United States v. Klein*, 533 F. Supp. 3d 1, 8–9 (D.D.C. 2021).

The Court must therefore decide whether Jackson should be detained on the basis of dangerousness. "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Munchel*, 991 F.3d at 1279 (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)); *see also* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence."). "To justify detention on the

4

basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" *Munchel*, 991 F.3d at 1279–80 (quoting 18 U.S.C. § 3142(f)). "Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety." *Id.* at 1280. The "dangerousness inquiry" is a "forward-looking determination." *United States v. Languerand*, No. 21-cr-353, 2021 WL 3674731, at *4 (D.D.C. Aug. 19, 2021) (quoting *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021)).

Assessing whether the government has made this showing requires consideration of four factors: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). The Court will address each in turn.

### A.  Nature and Circumstances of Jackson's Charged Offenses

On the first factor, Chief Judge Howell's six considerations for assessing the relative severity of a Capitol rioter's conduct provide a helpful framework for the Court's analysis. *See Chrestman*, 525 F. Supp. 3d at 26–27. Those considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses," (2) "engaged in prior planning before arriving at the Capitol," (3) carried or used a dangerous weapon during the riot, (4) "coordinat[ed] with other participants before, during, or after the riot," or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct,"

5

and (6) the nature of the "defendant's words and movements during the riot," including whether he "threatened or confronted federal officials or law enforcement." *Id.* at 26–27.

Here, the government concedes that the second, fourth, and fifth *Chrestman* factors "do not weigh toward the seriousness and violence of the offenses." Gov't's Opp'n to Def.'s Mot. ("Opp'n") at 7, ECF No. 28. The Court will therefore count these factors in favor of Jackson. Nonetheless, after balancing these factors with the remaining *Chrestman* factors, the Court concludes that the nature and circumstances of Jackson's offenses favor detention.

The first and third *Chrestman* factors are related in this case. The government argues that Jackson's offenses are serious because he is charged with five felonies, including the assault of police officers using a dangerous weapon. Opp'n at 6–7. It argues that Jackson used a flagpole as a dangerous weapon and intended to inflict bodily harm against police officers. *Id.* at 7. Jackson responds that the videos do not show that "the flagpole even made contact with any officer." Def.'s Reply to the Gov't's Opp'n ("Reply") at 4, ECF No. 32. He also claims that the flagpole was not a dangerous weapon because it was "thin," "wooden," and not capable of causing great bodily harm to "fully protected police officers in full riot gear at a distance." *Id.* at 4–6. At this stage, the Court declines to resolve the parties' disputes about whether the flagpole was a dangerous weapon or whether it hit an officer. Even if the flagpole was not dangerous, Jackson used it like a weapon when he launched it toward the line of officers, plainly intending to cause harm or at least interfere with the officers' duties. Thus, the first *Chrestman* factor weighs in favor of detention, whereas the third *Chrestman* factor does not weigh clearly in one direction.

The sixth *Chrestman* factor also weighs in favor of detention. The D.C. Circuit has stated that "those who actually assaulted police officers and broke through windows, doors, and

barricades . . . are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, 991 F.3d at 1284. Jackson's conduct falls closer to the former category. To be sure, Jackson's behavior on January 6 appears less violent than his brother Adam, who threw a large object at the same line of officers and rammed the officers with a police shield, which destabilized the officer line. *See* Order Granting Def. Adam Lejay Jackson's Mot. to Revoke Detention Order ("Jackson Order") at 7, ECF No. 26. But like his brother Adam, Jackson was no mere bystander. Videos show that he ran up near the officer line and hurled a flagpole toward officers who were already overwhelmed and outnumbered. *See generally* Gov't Exs. 1–4; *cf. United States v. Brockhoff*, No. 21-cr-524, 2022 WL 715223, at *5 (D.D.C. Mar. 10, 2022) ("That the means may have been less violent than, for example, bashing an officer with a flagpole, is immaterial. [Defendant's] actions were deliberate, and deliberately aimed at breaking police resistance. These actions show a blatant disrespect for the role of law enforcement and their efforts to maintain the safety of the Capitol and the lawmakers inside."). In addition, while at the Capitol, Jackson made a hand signal that is commonly associated with support for white supremacy which demonstrates his willingness to act on his hateful views, as will be discussed in detail below. Compl. at 7. In sum, considering the *Chrestman* factors as a whole, the Court finds that the nature and circumstances of Jackson's charged offenses weigh in favor of detention.

### B. The Weight of the Evidence Against Jackson

Moving to the second § 3142 factor, the weight of the evidence against Jackson also favors detention. Jackson avers that "it is not clear that [he] is the individual who through [sic] the [flagpole]." Reply at 4. To the contrary, Jackson "provide[d] helpful identification . . . in that he is often pictured with his brother and he is wearing distinctive clothing." Opp'n at 8. *Cf.*

7

*Languerand*, 2021 WL 3674731, at *1 n.3 (defendant's clothing made him identifiable). On that day, Jackson wore a black Harley-Davidson sweatshirt with a hood, a red hat that says "Trump 45th President," and a blue flag tied around his neck which formed a cape. Compl. at 4–6. In addition, his actions were captured on several videos from different angles. *See, e.g.*, Gov't Ex. 1 at 00:11–00:15; Gov't Ex. 2 at 01:46–01:50. As mentioned above, Jackson also disputes whether the flagpole he launched made any contact with police officers. Reply at 4. But at the hearing, government counsel represented that this fact is irrelevant because it is not an element to any of Jackson's charged offenses.[3] The Court agrees. Thus, this factor weighs in favor of detention.

### C. Jackson's Personal History and Characteristics

The next § 3142 factor weighs strongly in favor of detention. When evaluating a defendant's personal history and characteristics, a court should take into account the defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A).

The Court recognizes that Jackson has some positive qualities. Several family members and friends wrote in support of his release and described his community ties. *See* Attachments to Def.'s Mot. to Revoke Detention Order ("Mot."), ECF No. 25; Exs. A–M to Reply. Jackson is the father of several children, the youngest of whom is less than a year old. Reply at 7. His

---

[3] Count 2 of the Superseding Indictment describes an offense under 18 U.S.C. § 111(a)(1), which provides that in the event "the acts in violation of this section . . . involve physical contact with the victim," the defendant may face enhanced punishment. 18 U.S.C. § 111(a). But neither § 111(a)(1) or (b) treats contact with the victim as an underlying element of the offense. *See* Superseding Indictment (Count 2).

8

fiancée financially relies on him, as well as his parents, who are elderly and in poor health.  ECF No. 25-2; Ex. H to Reply, ECF No. 32-8.  Jackson was employed as an electrician prior to his arrest, ECF No. 25-1, and a job is apparently available for him at his father's company upon his release.  Ex. I to Reply, ECF No. 32-9.

On the other side of the scale, however, the Court has serious reservations about Jackson's criminal history, his lack of candor, and his willingness to act on his hateful views.  With respect to Jackson's criminal history, the government rightly points out that it is "long-running" and more serious than his brother's.  Opp'n at 9–11.  In his early 20's, Jackson had convictions for driving with a suspended license, a terroristic threat, and a drive-by shooting incident.  *Id.* at 10; *see* Pretrial Report as to Brian Jackson ("Pretrial Report") at 5–8.[4]  He was also convicted for driving while intoxicated and arrested for assault causing bodily injury.  Pretrial Report at 7.  At age 30, Jackson was convicted of burglary of a habitation and aggravated robbery.  *Id.* at 8.  According to the police report detailing the incident, Jackson and two other men invaded the home of an armed man to rob money from his safe.  Ex. 6 to Opp'n at 4, ECF No. 28-1.  They kicked down the man's apartment door and pushed him to the ground.  *Id.*  Jackson then punched the man in the face with his fist.  *Id.*  While Jackson held the man on the floor, the others confiscated the man's gun and searched the apartment for cash.  *Id.*  The three of them left the apartment with the man's gun and $300 in cash.  *Id.*  The report indicated that the incident was captured by the man's surveillance system that was set up both inside and outside the apartment.  *Id.* at 5.  For these felonies, Jackson was sentenced to fifteen years in prison.  *Id.*

---

[4] This report is located in an electronic folder the government shared with Jackson and the Court.

Upon returning to society after serving this sentence, Jackson got in trouble in a domestic violence incident with his ex-girlfriend. According to the police report, the officer who arrived on the scene found Jackson's ex-girlfriend covered in "a lot of" blood on her shirt and neck. Ex. 7 to Opp'n at 4, ECF No. 28-2. The officer also observed that she had a cut on her head and blood in her hair. *Id.* Jackson's ex-girlfriend said the cut was the result of Jackson slamming her head into the ground, but Jackson maintained that he did not touch her and had no idea where her injuries came from. *Id.* When the officer instructed Jackson to get into the officer's car, he physically resisted several times. *Id.* Jackson was eventually convicted of resisting arrest, search, or transport and sentenced to 192 days' confinement. Pretrial Report at 8.

In addition to Jackson's serious criminal record, the Court is concerned about his lack of candor. For example, during an interview with the U.S. Probation Office for the Southern District of Texas, Jackson claimed that no firearms existed in the home he lived in with his fiancée. *Id.* at 3. But when Probation sought to independently verify this information with his fiancée, she contradicted him and stated that there was a firearm in that home which belonged to her. *Id.* Likewise, at the hearing on the instant motion, when asked whether Jackson's ex-girlfriend suffered injuries from the domestic violence incident described above, defense counsel, after taking a moment to confer with Jackson, represented that she had no injuries from the incident. The Court does not purport to resolve whether Jackson *caused* his ex-girlfriend's head cut; it merely asked Jackson whether she was injured. Jackson's denial of that fact, coupled with his false firearms statement to Probation, demonstrate his apparent willingness to revise narratives at his convenience to evade potential legal consequences.

Finally, the Court is deeply troubled by Jackson's hateful views and willingness to act on them. On this point, the D.C. Circuit's recent decision in *United States v. Hale-Cusanelli*, 3

F.4th 449 (D.C. Cir. 2022), is instructive. In that case, the district court denied pretrial release to a January 6 defendant who was "not charged with any offenses involving violence or destruction of property." *Id.* at 453. Despite the defendant's lack of violence on January 6, the district court denied defendant release based on his "animus toward certain groups of people, his having acted on that animus in the past, and the possibility that he would do so again in the future." *Id.* at 454. The district court "primarily relied on" defendant's "extensive history of statements condoning violence against those of other races and religions to find that he was a danger to the community" and "posed a risk of escalating hate-motivated violence in the future." *Id.* at 457. The D.C. Circuit affirmed. *Id.* It ruled that the district court did not err in finding that defendant posed a risk of danger to the community based on, *inter alia*, defendant's "looking forward to a civil war" statements, the anti-Semitic remarks he made to coworkers, and an incident involving him and three others firing a potato gun bearing the words "WHITE IS RIGHT" and a drawing of a Confederate flag. *Id.* at 452–53.

As with the defendant in *Hale-Cusanelli*, Jackson's hateful words and actions persuade the Court that he poses an ongoing "risk of escalating hate-motivated violence in the future." *Id.* at 457. While incarcerated, Jackson was a member of the White Knights prison gang, a white supremacist group. Pretrial Report at 8. Photos from Jackson's Facebook account show a big swastika tattoo, Adolf Hitler's signature, and a drawing of a knight with "WK" on his back. Ex. 10 to Opp'n.[5] While at the Capitol, Jackson used a hand symbol that is commonly associated

---

[5] Jackson claims that he is no longer a member of the White Knights and wishes to remove his tattoos but cannot afford the monetary cost to do so. Reply at 14. But, as set forth above, the Court is unable to credit his uncorroborated assertions given his lack of candor in other contexts. Even if Jackson is no longer affiliated with the White Knights, the Court is skeptical that he has wholly abandoned his white supremacist convictions, as evidenced by his words and actions concerning January 6 which are described in detail in this section.

with support for white supremacy.  Compl. at 7 (image 8).  The government argues that even if the gesture might be innocent "in isolation," when "coupled with Jackson's history and other statements in relation to January 6, it is clear that he was espousing white supremacist views on January 6."  Opp'n at 12.  The Court agrees that it is "more than a coincidence" that Jackson made this symbol on January 6, *Hale-Cusanelli*, 455 F.4th at 455, and unlike the defendant in *Hale-Cusanelli* whose conduct on January 6 was nonviolent, Jackson acted on his convictions by hurling a flagpole at the officer line, *see* Gov't Ex. 1 at 00:11–00:15; Gov't Ex. 2 at 01:46–01:50.

Jackson's post-January 6 communications confirm his willingness to act on his animus toward other people.  Just a few days after January 6, Jackson bragged to another person over text message that he was involved in "[a] couple" fights at the Capitol including "chas[ing] a few [n-word] off to on [sic] the streets" and that there was "nothing but [n-word] there."  Compl. at 12.  Jackson's own account of that day therefore provides "some evidence" that he "acted violently based on his racist ideology."  *Hale-Cusanelli*, 455 F.4th at 455.  Moreover, like the defendant in *Hale-Cusanelli*, Jackson described January 6 using civil-war language.  *Id.* at 452.  When someone texted him, "Shits get reals n we ready to go to civil war," he not only agreed with the statement but also took credit for his actions as part of the effort: "[T]rue that I mean after all I tbink [sic] we started the beginning of a revolution."  Ex. 8 to Opp'n at 1.  The person also said, "It's going to come down to it and we're going to have to take back our great country I'm not surrendering any of my weapons I'll die a free man with a gun in my hands," to which Jackson responded, "I hear ya and I'm with ya."  *Id.*  These statements indicate that Jackson's views on civil war do not just pertain to January 6 but are forward-looking to the future.  In light of Jackson's long and violent criminal history, his lack of candor, and his demonstrated

willingness to act on his hateful ideology, the Court finds that Jackson's history and characteristics weigh strongly in favor of detention.

### D. The Nature and Seriousness of the Danger Jackson's Release Poses

The final factor in assessing dangerousness also favors detention. Assessing the "'nature and seriousness of the danger . . . posed by the defendant's release' . . . 'encompasses much of the analysis set forth above, but it is broader in scope,' requiring an 'open-ended assessment of the seriousness of the risk to public safety.'" *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *5 (D.D.C. Mar. 10, 2021) (first quoting 18 U.S.C. § 3142(g)(4); and then quoting *United States v. Taylor*, 289 F. Supp. 3d 55, 70 (D.D.C. 2018)). "Because this factor substantially overlaps with the ultimate question whether any conditions of release 'will reasonably assure . . . the safety of any other person and the community,' it bears heavily on the Court's analysis." *Id.* (quoting 18 U.S.C. § 3142(e)).

For many of the reasons described above, the Court finds that Jackson poses a prospective danger to the community. Jackson's violent conduct on January 6 shows a clear disregard for law enforcement. Jackson engaged law enforcement on that day and proudly viewed his actions as part of a violent civil-war narrative. His hateful words and actions show that he is a danger to the community. Combined with his long and violent criminal history as well as his lack of candor, the Court is deeply troubled that he is at risk of escalating violence in the future if released. The Court therefore agrees with both the Probation Office of the Southern District of Texas and Magistrate Judge Edison in concluding that Jackson should be detained. *See* Pretrial Report at 9; Gov't Ex. 5 at 96–97.

For his part, Jackson emphasizes that the government's 17-month delay in arresting him, and his peaceful conduct during this period, are evidence of his lack of dangerousness. Mot. at

4; Reply at 13. The government counters that it is "common" for investigations "to take many months (and even years in some cases) before arrest or indictment." Opp'n at 16. Jackson's argument has some merit. In Adam Jackson's case, the Court found that the government's delay weighed in favor of his release. *See* Jackson Order at 11. But the Court did not treat the government's delay as dispositive; instead, it weighed all of the factors under § 3142 and found that it was a "close case." *Id.* at 11. Unlike Adam's case, each of the § 3142 factors here weigh in favor of Jackson's detention. And unlike Adam, Jackson's behavior during the 17-month period was not spotless. The government has provided evidence showing that during this period, Jackson destroyed some of his fiancée's property over an angry fit, a fact Jackson did not dispute at the hearing. Opp'n at 14; *see* Ex. 9 to Opp'n. In light of all the circumstances, the Court declines to release Jackson solely on the basis of the government's delay.[6]

The Court finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community" were Jackson released pending trial. 18 U.S.C. § 3142(e). The Court therefore denies Jackson's motion.

### V.  CONCLUSION

For the foregoing reasons, Defendant's motion (ECF No. 25) is **DENIED**.

**SO ORDERED**.

---

[6] The government also contends that Jackson "knowingly engaged in obstructive conduct" by deleting Facebook videos and posts that he created relating to January 6. Opp'n at 11. But the Bail Reform Act permits detention on this basis only if there is "a serious risk that such person *will* obstruct or attempt to obstruct justice." 18 U.S.C. § 3142(f)(2)(B) (emphasis added). Moreover, many of the January 6 defendants this Court has sentenced have engaged in similar behavior and the government has not sought pretrial detention. The government has not explained how Jackson is at risk of obstructing justice in the future or how deleting social media content is relevant to the dangerousness inquiry. Therefore, the Court did not consider this in its analysis.

Dated: October 3, 2022                                                                RUDOLPH CONTRERAS
                                                                                                                           United States District Judge

Case 1:22-cr-00230-RC    Document 33    Filed 10/03/22    Page 15 of 15