UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:22-CR-00230 (RC) |
| | ) | |
| BRIAN JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Comes now the Defendant, BRIAN JACKSON, by and through undersigned counsel, and submits this Memorandum in Aid of Sentencing. For all the reasons below, Mr. Jackson asks this Court to impose a sentence with a downward variance, should the Court accept the enhancements recommended in the Presentence Investigation Report, and otherwise considering the United States Sentencing Guidelines (USSG). that are not mandatory for time served, with an order for release from jail incarceration on August 6, 2024, and one year of supervised release, with restitution as agreed to in the plea and no fine. He submits the following:

I.     **INTRODUCTION.**

Mr. Brian "Scott" Jackson expresses his deep remorse for violating the law on January 6, 2021. When deciding to travel to Washington, D.C. to hear the speakers at the Ellipse rally, he wanted to accompany his younger brother and a good friend to hear then President Donald Trump speak. He did not travel with any intent to violate any law. Brian had no expectation of even going to the U.S. Capitol building. He did not bring clothing or tactical gear in preparation for any violence.

Brian Jackson does not condone the violence by any parties that occurred at the U.S. Capitol on January 6, 2021. The trip turned into a drunken party with his brother, Adam Jackson,

and a friend, and he expresses his remorse for his lack of judgment in throwing a flagpole over the Metropolitan Police Officers' heads. Brian is clear that he should not have done this despite his drunken panic after seeing his brother run into the police line and then disappear. He cannot even remember who gave him the flag on its flimsy, light wooden pole. What he recalls is that he had clouded judgment where he panicked and wanted to see what happened to his brother who had run into the police line.

Brian, his brother, and their friend had not been together for many years and the trip turned into a many years' belated party. They started "celebrating" heavily at dinner on the night of January 5, 2021. They went to the Ellipse at approximately 5:00 a.m. on January 6, 2021, and peacefully attended the rally.  They continued drinking early that morning in a foolish means of thinking it would keep them warm.

Brian is known to friends and family as a hardworking, skilled electrician who normally does not engage in the type of behavior, especially binge drinking, that he exhibited in D.C. Aside from not wanting to electrocute himself or do poor work that could cause a hazard, at home he did not drink to excess even on weekends, responsibly worked hard, and took care of family. He is regarded lovingly as a son, father, brother, uncle, grandfather, and friend.

Brian, his brother, and their friend left the rally before the end of President Trump's speech to go to lunch. They ate and then drank some more. Brian had no awareness of  the events going on inside the U.S. Capitol building that afternoon. He knew nothing about Vice President Pence's location or vote counting. It was close to 4:00 p.m. when they heard there was some activity at the U.S. Capitol and, out of curiosity,  went to see what rally was happening.

Brian did not see any "Area Closed" signs as hundreds of people were entering and leaving, with thousands flooded across the west lawn of the Capitol. They remained for some time at ground

level, talking to small groups of people and continuing to drink. Brian jovially used his phone to take videos of the variety of people in the crowd. Video previously shown at his bond hearing shows the bottle they brought being passed around. Brian and his brother joked about the men dressed in military gear going forward and them following. There was no leading and/or following others after the joking.

There were no police visible at ground level. Crowds were standing and moving around on the multiple west terrace levels. The three men were not told to leave the area and were not subjected to the pepper spray, flash bangs, and rubber bullets that had been used earlier by police. Curious, they moved forward and upward to see what was going on at the terrace level. They were not part of any group or plan. They were three inebriated men acting foolishly without comprehending the violence that had been occurring on that side of the Capitol before they arrived.

After ascending, Brian's brother and the friend climbed a ladder while Brian continued to walk around taking video. When their friend sought out Brian and told him that Adam was going toward the police - at what we now refer to as the "tunnel" - Brian went looking for his brother. His "older brother" protective instinct kicked in.  Things went badly downhill from there as Brian believed Adam had been taken away by the police. He does not excuse his drunken action of throwing the flagpole over the police officers' shielded heads, and asks for forgiveness for the completely misguided act that in his clouded mind at the time was part of keeping his brother from being harmed. He pled guilty because he takes responsibility for throwing the flagpole to keep police from taking his brother. He wanted to get their attention without causing any harm. He admits that his misguided approach was to retrieve his brother.

Brian knows that he cannot go back in time and correct this one bad act. He is remorseful for that act, because he previously spent time in Texas prison for assault involving drugs by others.

He paid his dues by many years incarcerated and completed his release period. He regrets his criminal history. Because the Texas prisons were overrun by competing gangs at the time of his lengthy incarceration, he chose a side in order to survive. He later denounced the group and its supremacist underpinnings. The group no longer exists. But Brian's tattoos are a painful reminder. He signed up for a Texas prison program to have the tattoos removed, but he was never afforded an opportunity to have the tattoos removed, as the removal of those tattoos was cost-prohibitive to pay for on his own.  He is willing to undergo the pain of the process, but the expense was not in his budget after he was released. The tattoos are an unwelcome reminder of his past, especially since his best friend is African American.

The video exhibit drive delivered to the Court, where the government will also provide its USAfx site for upload, conveys love but also the loss that Brian caused. The letter exhibits, attached hereto and incorporated herein, add further context, without repeating the support letters that were submitted for his bond hearing in September 2022. His family in Texas has not seen him since June 2022. His newborn daughter, shown in the exhibit, is now over two years old. Brian missed her first steps and first words. His older children do not have the ability to call their dad so he can listen to their concerns and offer fatherly advice.

Brian's father is planning on retiring and is counting on Brian to take charge of the business since Brian's brother Adam is trying to salvage his own business. Both of Brian's parents hope he will be released so that he can work as a useful member of the community. They want him to be able to assist them at home, given their crippling disabilities - as he did before being incarcerated in June 2022. Mr. Jackson's common-law wife (or fiancée) has waited for him so they can have their wedding. They were planning to marry and purchase her father's home so that he could get out from the burden of home ownership and live comfortably in his remaining years. The video

exhibits talk to some of these issues where the punishment of prison does not just work against Brian Jackson. This heavy burden and loss of assistance is the result of Brian's stupid act. But the family and Brian ask the Court to consider options beyond continued imprisonment.

## II.        APPLICATION OF SECTION 3553 FACTORS

Under the majority opinion in *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. See 18 U.S.C. § 3553(a)(4)." *United States v. Booker*,  543 U.S. 220 (2005). The Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Pursuant to 18 U.S.C. §§ 3562 and 3553(a) as endorsed by *Booker*, sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above. Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Section 3582 of Title 18 states that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and,

> if a term of imprisonment is to be imposed, in determining the length of the
> term, shall consider the factors set forth in Section 3553(a) to the extent that they
> are applicable, recognizing that imprisonment is not an appropriate means of
> promoting correction and rehabilitation.

18 U.S.C. § 3582.

## III.   DISCUSSION.

**A.   Using § 3353(a)'s Sentencing Factor: Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, Mr. Jackson Should be Released From the D/C. Jail on August 6, 2024, for Time Served.**

Mr. Jackson admits and takes responsibility for the seriousness of his act of throwing the flagpole over the police officers' heads. To demonstrate this further, although advised that at a trial he may have argued that, under 18 U.S.C. § § 111(a) and 1114, the Metropolitan Police Department (MPD) were not federal officers, and there is no record of any valid authority for them policing on the U.S. Capitol grounds under either their MPD General Orders or 2 U.S.C. § 1961, he accepts responsibility for acting badly against any police. He did not want to argue the jurisdiction and official duty status technicality at trial. He wanted to and does accept responsibility that he should have known better than to have acted this way despite the drinking binge of that 24-hour period.

Mr. Jackson has respected the directives, rules, and orders of his security officers at the Northern Neck VA, Pennsylvania, and D.C. jails for his entire period of incarceration. He will support and show respect for police upon his release. For the approximately 517 days between January 6, 2021, and his June 7, 2022 arrest, he violated no laws and was a peaceful hardworking man. He had many friends at work. He was a groom at his best friend's wedding, as shown in the picture exhibits and video exhibit. Family members asked him for assistance, and he willingly gave it. He helped in the community.

As of sentencing he will have physically served 26 months in jail. Brian Jackson has already served a jail sentence sufficient to accomplish that goal of sentencing. When considering

the First Step Act, with 116 days for good time served (108 days for two years +8 days for the two months), and a conservative estimate of 160 days productive work (10 days x 16 months of work) is added, <u>Brian Jackson will have constructively served a thirty-three month prison sentence</u> (24 +9.2 months).   His brother, also assisting his parents when possible and without the criminal history points of Brian, but whose actions might be considered more culpable for the Section 111(a) charge on January 6, 2021, was shown mercy by this Court in its consideration of a sentence that would accomplish the goals of sentencing under 18 U.S.C. § 3553(a).

The "overarching instruction" of 18 U.S.C. § 3553(a) is to "'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). Mr. Jackson's sentence of time served meets *Kimbrough*.

The 18 U.S.C. § 111(a) crime he pled guilty to is serious. Mr. Jackson neither says nor thinks anything contrary to that. He does not use his inebriation as an excuse. He references it to say that January 6, 2021, does not reflect the man he had become after already having learned hard lessons in life by his past errors in judgment and action. He was relied upon across the family, especially by his and his fiancée's elderly parents. Brian was a rock for his fiancée's father when his wife passed away. He contributed significantly to helping his own father keep his business afloat. His family is praying for your mercy in that he may return to see them all and be there for them.

The undersigned did argue the enhancement by the government's estimate in the plea's agreement for the deadly and dangerous weapon. The PSR accepted the Plea Agreement language. Mr. Jackson's flagpole throw was not done with intent to cause serious bodily injury or death. He was a high school baseball player and despite being drunk on January 6th, if he had aimed at the police officers' bodies, he would have hit their protective shields - which he did not. He did not

intend bodily injury in his state of panic over his missing brother. The Court should assess that he did not use a non-inherently dangerous object as required under the Circuit's *Arrington* standard that made it a deadly and dangerous weapon. He is not arguing against his acceptance for tossing the flagpole over the MPD officer's heads. But we do argue here that calling the flagpole a deadly and dangerous weapon is not warranted based on the facts.

To avoid sentence disparities, the Court should consider that in many cases the DOJ dropped charges of a dangerous weapon either in plea deals or in the charging document. The government would not offer that here, despite requests.

> "A pro-Hamas protester from New York, Ruben Arthur Camacho, was sentenced to just  48 hours of community service for punching a female cop during a riot outside the Democratic National Committee headquarters in November. Camacho slammed a female officer against a wall and punched her in the face. Camacho was charged with one count of assault on a police officer...
> Camacho also resisted arrest and blocked an exit used by federal lawmakers during the riot, according to court documents."

Tampa Free Press https://www.tampafp.com/pro-hamas-rioter-gets-community-service-after-punching-female-u-s-capitol-police-officer-in-dc/  See: https://www.theepochtimes.com/us/pro-palestinian-protester-avoided-jail-time-after-punching-female-capitol-police-5653364 or for the circumstances: https://www.washingtonpost.com/dc-md-va/2023/11/16/dnc-protest-israel-gaza-ceasefire-police/

Six Capitol Police Officers were injured as the rioters blocked legislators from safely exiting the building. Camacho was not charged with the federal crime of 18 USC § 111(a) or (b), and was only charged in DC Superior Court by D.C.   United States Attorney Matthew Graves.

Just this past week, pro-Hamas and Pro-Palestinian rioters attacked U.S. Park Police in D.C. near Union Station, while also damaging government property, including monuments, and stealing and burning the U.S. flag. No manhunt is apparent, with four reported arrests, and all released immediately on bail by the  D.C. court. No federal charges are apparent, and D.C. ;aw will likely consider most of the acts to be sentenced as misdemeanors, if at all.

For January 6th cases, the pleas allowed by the DOJ and the enhancements have been inconsistent, with AUSAs saying they receive marching orders from above where there is no bargaining as here.

Brian's co-defendant brother, Adam, who threw an object into the shields of the MPD officers and ran into the police line, was released after three months from pretrial incarceration. He pled to § 111(a) and received a sentence from this Court of three years' probation with the first year to include 52 weeks of consecutive intermittent weekend prison. The Court did consider the impacts on continuous incarceration and Brian asks that given similar circumstances with family and keeping his father's business and livelihood afloat that the Court consider leniency, with the sentencing purposes of prison already met.

A few examples of sentences will be presented here. David Blair, (1:21-cr-186) whose lacrosse stick made some incidental contact with police was allowed to plea to 18 USC § 231(a)(3) Civil Disorder and received 5 months imprisonment plus supervised release of 18 months. Brian was not given that alternative plea opportunity. Eric Cramer (1:22-cr-339) carried a baseball bat and entered the Capitol building. He received 8 months imprisonment and 12 months of supervised release. Aaron Mostofsky (1:21-cr-138) pushed against police, went inside the building, took a police vest and riot shield, and carried a large walking stick but was not charged with a dangerous weapon; and after pleading guilty to multiple felonies was assessed as having 13 points and received 8 months prison and 12 months of supervised release. Hunter Ehmke (1:21-cr-029) who broke a window on the east side received 4 months in prison. Several defendants who were charged with assault ended up pleading to 18 U.S.C. § 231(a) Civil Disorder and received under a year in prison. Mark Jefferson Leffingwell (1:21-cr-005) pled guilty to §  111(a)(1) for assaulting two officers inside the Capitol, and was sentenced to 6 months of incarceration. Grayson Sherrill,

(1:21-cr-282) pled guilty to § 111(a)(1) for assaulting an officer with a metal pole that he then took inside the Capitol. The government requested 41 months, and the Court sentenced him to 7 months of incarceration. On the other hand, some former law enforcement men have been given highly enhanced, lengthy sentences, with multiple felony convictions.

Brian Asks this Court to consider his incarceration as punishment served by him and not to further separate him from his parents who need his help at home.

### B. Adequate Deterrence has Already Been Enacted.

Mr. Jackson's aspirations and hope for a positive future leave no room for criminal behavior or recidivism. He is fully aware every day of the wrongfulness of his flagpole throwing on January 6, 2021. He has criminal history points that will turn him into an old man in prison if he commits another crime in Texas. He has lived in roach and rat-infested jails since June 2022, where mold is widespread and the lack of nutritional quality in the food is unspeakable. He cannot see his youngest child and the rest of his family that reside in Texas. He cannot do the daily work that fulfilled his life and gave him the ability to take care of others in the years before June 2022. His truck was repossessed. He has no savings. He has lost everything but his faith in God, and the friends and family who stood by him.

### C. There is No Element of the Public that Needs Protection From Mr. Jackson.

Mr. Jackson understands his misguided judgment in his prior criminal acts, where protection of family does not excuse what he did. He is not a drug dealer, gang member, sex offender, or among the host of other criminals who have high recidivism rates. The members of his community and family have expressed that they will feel safe having him return home. They

know he will again be a productive member of the community and good citizen. Mr. Jackson asks this Court to give him the opportunity to show his value to society.

**D. Prison is Not Going to Provide Education or Vocational Training, Nor Medical Care**.

Mr. Jackson has a skilled vocation as an electrician. He is a member of a union in Texas and will be able to be employed upon returning home. In his business, Brian's father still has customers that ask for Brian to do their electrical work. Mr. Jackson 's health has suffered from the  poor diet in jail, and despite being prescribed a soy free and particular diet, has not received quality food to return his health.

**E.  The Court Should Consider Not Applying the Official Victim Enhancement.**

The government and PSR use USSG § 2A2.2 (aggravated assault) instead of USSG § 2A.2.4 (interfering, impeding, or obstructing police), where §  2A.2.4 already accounts for an official victim. The §  2A2.2 enhancement would  apply in this Circuit under the USSG if Mr. Jackson was convicted of committing another felony. He was not. The facts show no official victim - and no victim at all, unlike in his brother's case. The government cannot produce any officer struck by Brian Jackson because no such officer exists.  The facts do not support  a claim of an official victim when § 2A2.2 is used in this case.

**F.  The Court Should Consider Not Applying the PSR's Enhancement For Use of a "Deadly and Dangerous Weapon."**

As briefly discussed in Section A. *supra*, the charging and enhancement for a non-inherently dangerous object as a deadly and dangerous weapon, as well as sentencing, varies. The application of the deadly and dangerous weapon here should be assessed according to the Circuit's caselaw in *Arrington*.  The Court held that, "[f]or an object that is not inherently deadly [such as a gun], … the object must be capable of causing serious bodily injury or death to another person and

the defendant must use it in that manner." *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002). The applicable caselaw in this Circuit and all other circuits makes clear that a non-inherently dangerous object must be used with the intent and in a way to cause serious bodily injury or death. See, e.g, *U.S. v. Stapleton*, 440 F.3d 700, 702 (5th Cir. 2006); *United States v. Swallow*, 891 F.3d 1203, 1205 (9th Cir. 2018); *United States v. Hollow*,747 F.2d 481, 482 (8th Cir. 1984).

This Court is well aware that a flagpole is not an inherently dangerous object. Some January 6th defendants used flagpoles to deliberately beat officers multiple times. Others made incidental if not unintended contact. Brian made no contact. He never intended contact. The fully armored officers had a protective covering of riot shields above their helmeted heads, and in front of them, thus making any injury nearly impossible. Nowhere in the Statement of the Offense did Mr. Jackson plead to having intent to cause serious bodily injury or harm. The elements of the crime do not list dangerous weapons, or intent to cause bodily injury or harm. (ECF No. 77 at 5-6). An exhibit for the sentencing will show the flag throw that hit nobody. He still accepts responsibility for his act as being wrong.

**G.  The Court Should Take First Step Act Times into Account and Release Mr. Jackson at Sentencing on August 6, 2024.**

As previously discussed, as of sentencing Mr. Jackson will have physically served 26 months in jail. When considering the First Step Act, with 116 days for good time served (108 days for two years +8 days for the two months), and a conservative estimate of 160 days productive work (10 days x 16 months of work) is added, Brian Jackson will have constructively served a 33 month prison sentence (24 +9.2 months). The Bureau of Prisons (BOP) will likely take 60 days to assign him to a federal prison, and then an additional 90-120+ days at his destination to assess his constructive time served (should that actually occur).

### H.  Mr. Jackson Requests that No Fine be Assessed.

The PSR shows that he cannot afford a fine. Brian has had no income since incarcerated. He has no medical health insurance. He has no vision or dental insurance. Those costs are not fairly factored into his already negative monthly cash flow.  He is sincere in saying that he is remorseful for violating the law and will be fully engrossed in re-establishing employment and returning to all the positive things he did in his community. He is a skilled electrician with a superb work reputation. He wants to support his youngest daughter and help out his parents and future father-in-law. He did not cause property damage or personal injury and asks to not be assessed a fine that he cannot afford to pay.

### I.  The Court Should Limit Supervised Release to One Year.

The purposes of supervised release will be exhausted by one year. Supervised release and conditions align closely with sentencing. Pursuant to § 3583(d), the applicable, relevant conditions of supervised release must:

> [1] be reasonably related to at least one of the following: the nature and circumstances of the offense, the defendant's history and characteristics, the deterrence of criminal conduct, the protection of the public from further crimes of the defendant, and the defendant's educational, vocational, medical, or other correctional needs.
> [2] ... involve no greater deprivation of liberty than is reasonably necessary to achieve the purpose of deterring criminal activity, protecting the public, and promoting the defendant's rehabilitation.
> [3] ... be consistent with any pertinent policy statements issued by the Sentencing Commission.

The above factors were addressed under 18 U.S.C. § 3553(a). Mr. Jackson has served time in jail for the seriousness of his offense. He lacked judgment on January 6, 2021 but his act was not one of anger - it was protectionist panic under clouded judgment. He presents no threat of further crimes and needs no lengthy supervision for "deterrence." He knows that his criminal

history points will lead to a lengthy period in Texas prison if he breaks any law there. He has already spent 26 months physically incarcerated without any credits applied under the First Step Act.

Depending on the economy and location of work projects, he may need to move into gig type work that involves travel across districts in Texas, during emergencies or not, while also keeping his father's business afloat. A lengthier period of supervised release portends to be a greater deprivation of liberty than necessary for sentencing and the § 3583(d) factors' purposes. Mr. Jackson faces many challenges, but none include future criminal activity.

## IV.   CONCLUSION.

Summing up the tight-knit family for deterrence, Brian's sister-in-law (Adam's wife) wrote,

> Scott has family out here that miss him dearly, our family has
> missed him the last two Thanksgivings, two Christmas's, and almost 3 full
> birthdays come August. He has kids, grandkids and crazy enough a toddler that
> have missed him the past 3 Father's Day, Grandparents day, and would love to
> have him back in their daily lives.

Wherefore, Mr. Jackson prays that the Court will release him on August 6, 2024, given that he calculates his constructive incarceration to already be approximately 33 months at least if the First Step Act is considered. He is remorseful for the events of January 6, 2021, and for his behavior. He will commit no future crime. He asks the Court to consider allowing him to return home to provide support to his bride to be, his baby daughter, his adult children, and his elderly, disabled parents who need his support. He has a loving family and support network that will be a daily deterrent against any criminal act while Mr. Jackson reestablishes himself as a useful member of his community.

Dated July 29, 2024

Respectfully Submitted,

/s/ John L. Machado
John L. Machado, Esq.
Bar No. 449961
Counsel for Brian Jackson
Law Office of John Machado
503 D Street, N.W., Suite 310
Washington, DC 20001
Telephone: (703) 989-0840
E-mail: johnlmachado@gmail.com

/s/ *Carolyn Stewart*
Carolyn Stewart, Esq.
D.D.C. Bar No. FL0098
Defense Attorney
Stewart Country Law PA
1204 Swilley Rd.
Plant City, FL 33567
Telephone: (813) 659-5178
Email: Carolstewart_esq@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify on the 29th day of July, 2024, a copy of the foregoing was served upon all parties as forwarded through the Electronic Case Filing (ECF) System.

/s/ Carolyn Stewart
Defense Attorney

15