**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-230 (RC)** |
| **BRIAN JACKSON,** | |
| **Defendant.** | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Brian Jackson to 52 months of incarceration, at the mid-point of the advisory guideline range of 46 to 57 months, 36 months of supervised release, $2000 in restitution, and the mandatory special assessment of $100.

**I.      INTRODUCTION**

The defendant, Brian Jackson ("Jackson"), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]  Jackson was a ready, willing, and enthusiastic participant in the chaos that gripped the

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum.  However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Capitol on January 6th.   Along with his brother, Adam Jackson ("Adam"), and a friend, Jackson traveled to Washington, D.C. for the rally, but did not go to the Capitol immediately after the rally. Instead, Jackson and his companions chose to go to the Capitol only knowing that a violent riot was in progress. Once they arrived at the Capitol, they made their way to the Lower West Terrace. There, they waited and watched the violence, hoping that rioters clad in tactical gear would make entry into the Capitol building so they could follow.   When it became clear the police in the tunnel were holding their ground, Adam took matters into his own hands.   He charged up the steps carrying a stolen shield and violently rammed it into the police line at the mouth of the tunnel.   Seconds later, Jackson hurled a wooden flagpole at the officers like a spear.   Then, standing on the steps leading to the tunnel, Jackson angrily gestured and spewed vitriol toward the police because they refused to give way.   The United States recommends that the Court sentence Brian Jackson to 52 months of incarceration for his violation of 18 U.S.C. § 111(a)(1).   A 52-month sentence reflects the gravity of Jackson's conduct and the need for general and specific deterrence.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The United States refers the Court to the stipulated Statement of Offense filed in this case, ECF No. 77, for a short summary of the January 6, 2021 attack on the United States Capitol by thousands of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.      Brian Jackson's Assaultive Conduct at the Capitol**

On January 5, 2021, Jackson flew from Texas to Washington, D.C., with his brother and co-defendant , Adam, and a friend.[2]   Jackson anticipated that there would be violence in Washington, D.C., and was looking forward to it with excitement.   On the day before the trip, he texted his fiancée, saying,

> Gonna be a crazy ride tomorrow all kinda shits gonna go down on the 6th they are saying a civil unrest is gonna happen I can't fuckin wait !! Goin down with my boots on !!

On the morning of January 6th, Jackson (then 46), his brother, and the friend attended the "Stop the Steal" rally at the Ellipse.   They took pictures and made video clips of several speeches. After the rally, they went back to their hotel.   Later that afternoon, long after every television network had begun broadcasting the riot, they left their hotel room and went to the Capitol, arriving at the Peace Circle at about 3:38 p.m.   As they approached the West Front of the Capitol building, they would have seen indications of the chaos that lay ahead, such as downed fencing, debris, police lines, and pepper spray.

Once on the West Plaza , Jackson and company talked with other rioters and recorded video. At one point, Adam saw several rioters heavily outfitted in tactical military gear filing by and encouraged them to enter the Capitol building:

> Are we going in?
>
> We got your back; let's go.
>
> Hey, you know what - if one goes, we all go.
>
> We're waitin' on y'all.
>
> What are we doing standing here?   Let's go!

---

[2]   Adam Jackson pled guilty on September 29, 2023 to one count of Assault on a Police Officer (18 U.S.C. § 111(a)(1)).   (ECF No. 60)   He was sentenced to 3 years of probation, with the condition that he serve 52 consecutive weekends in jail.   (ECF No. 86)   The friend is not currently charged.

Jackson confirmed their intention to enter the Capitol following the gear-clad rioters, saying, "Yeah; we *will* follow. That's for sure."   (Exhibit 1 at :08 - :20); *See* Image 1, below.



*Image 1 (Adam Jackson – framed in yellow - speaking to individual wearing tactical gear)[3]*

At approximately 4:15 p.m., amid a crowd of rioters densely assembled on the Lower West Terrace, as Jackson looked on, Adam and the friend climbed to the top of a ladder and took videos of the crowd.   From that vantage point, Adam was able to survey the violence taking place at the mouth of the Lower West Terrace tunnel.   *See* Image 2, below.   The three men were eager to be

---

[3] Image 1 is a screen shot from Exhibit 1, a video made and uploaded to Facebook by Brian Jackson, at 0:18.

part of what was going on there.   Immediately thereafter, Jackson and company made their way

through the dense crowd to the vicinity of the tunnel entrance.



*Image 2 (Adam's phone zooming in on the chaos at the LWT tunnel)[4]*

As Jackson approached the tunnel, he saw USCP and MPD officers fending off rioters who

were attacking and attempting enter the Capitol Building by way of that entrance.   *See* Image 3, below.

Adam had obtained possession of a stolen police shield.   *See* Image 3, below.

---

[4]  Image 2 is a screen capture from a video made by Adam Jackson while atop the ladder.



*Image 3 (Brian Jackson - framed in red; Adam Jackson - framed in yellow)*[5]

Jackson took a video (Exhibit 2) of Adam holding the shield at the ready, bragging in his narration that Adam had stolen it from the besieged officers: "Adam got a god-damned shield, stole it from the fucking popo!"   *See* Image 4, below.

---

[5]  Image 3 is a photo posted to Facebook by the brothers' friend.



*Image 4 (Adam Jackson - framed in yellow - holding police shield just prior to assault)*[6]

At about 4:57 p.m., Jackson watched his brother assault the police officers at the mouth of the Lower West Terrace tunnel, first by heaving a large, red/orange cone-like object at them, and then by charging and ramming the defensive line with a police riot shield.   (Exhibit 3)   *See* Image 5, below.

---

[6]  Image 4 is a screen capture at :09 from Exhibit 2, a video posted to Facebook by Brian Jackson.



*Image 5 (Adam Jackson, wearing flag cape, ramming the police line with shield)*[7]

Jackson and other rioters at the tunnel seemed to be instantly energized by Adam's audacious action, in as much as they commenced a reinvigorated assault.   About 7 seconds after Adam made contact with the police line, Jackson personally contributed to melee by launching a wooden flagpole like a spear at the police officers in the tunnel.   *See* Images 6, 7, below.   (Exhibit 4)

---

[7] Image 5 is a screen capture from Exhibit 3, which is a publicly available video, at :35.



*Image 6 (Jackson – circled in red – about to throw flagpole- circled in yellow)[8]*

---

[8] Image 6 is a screen capture from Exhibit 4, which is a publicly available video, at :13.



*Image 7 (Jackson – circled in red – having just released flagpole- circled in yellow)[9]*

The flagpole sailed just over the front-line officers' heads and landed among the officers further

back in the crowded tunnel.   *See* Images 8, 9, below.   (Exhibit 5)

---

[9] Image 7 is a screen capture from Exhibit 4 at :14.



*Image 8 (flagpole flying into the tunnel like a spear - circled in yellow)[10]*



*Image 9 (flagpole about to strike officers in the tunnel – flying flagpole circled in yellow)[11]*

---

[10]  Image 8 is a screen capture from Exhibit 5 at :25.
[11]  Image 9 is a screen capture from Exhibit 5 at :26.

After the assault, Jackson and his friend remained on the steps, angrily taunting the officers in the tunnel.  *See* Images 10, 11, below.   (Exhibit 6)



*Image 10 (Brian Jackson, with friend, gesturing at officers from the tunnel steps)* [12]

---

[12]  Images 10 and 11 are screen captures from Exhibit 6, which is Capitol surveillance video, at 6:56 and 6:59, respectively.



*Image 11 (Brian Jackson, with friend, after pulling down his mask to yell at officers)*

Later, Jackson and company celebrated their attacks by making hand gestures and shouting.[13]
*See* Images 12, 13 below.   The depicted hand gesture, which resembles the "okay" sign, is known
to be associated with white power.

---

[13]  It can be seen that Jackson has a bleeding cut on his nose, and Adam Jackson has blood on his
hand.



*Image 12 (Brian Jackson - framed in red - celebrating)*[14]



*Image 13 (Brian Jackson gesturing)*[15]

---

[14] Image 12 is a screen capture from a publicly available video.
[15] Image 13 is a screen capture from a publicly available video.

### C.      Brian Jackson's Post-January 6th Statements

Jackson felt no remorse for his participation in the violence that day. To the contrary, in the early evening of January 6th, Jackson sent text messages expressing intense pride about having "fucked that capital [sic] up" and called the police who risked their lives that day "traitors":

> **@ 6:12 P.M.  -**  [ . . . ] we fought the bitch ass traitor cops we told them to stand down and fight on our side they refused we went to war we survived [ . . . ]
>
> **@ 6:51 P.M.  -**  Oh shit tam you have no idea we just fought those hoe ass traitor cops
>
> **@ 6:52 P.M  -**  We fought hard inside the capital we are soldiers we fought for America today we made history today !!!
>
> **@ 6:54 P.M.  -**  We love our president and we stood up for America today be proud we did it and fuck these hoe ass cops that are traitors we fucked that capital up today !!!

Though proud of his actions, Jackson was well aware he had committed serious crimes on January 6th, and, soon afterwards, he deleted evidence that showed his participation in the riot.   On January 7, 2021, he admitted to his fiancé, "I deleted everything."   He also asked others to delete incriminating videos and messages he had previously sent to them.   On January 9, 2021, Brian Jackson had the following exchange with a Facebook contact ("Individual-1") in which he not only asked for help in destroying evidence, but admitted that his violent conduct on January 6 was not limited to his time at the Capitol:

> **Individual-1:**   It's going to come down to it and we're going to have to take back our great country I'm not surrendering any of my weapons I'll die a free man with a gun in my hands bubba
>
> **Jackson:**   I hear ya and I'm with ya fuck NOW !!!
>
> **Jackson:**   Delete those videos
>
> **Individual-1:**   Will do
>
> **Individual-1:**   You still in Washington or back in Texas

**Jackson:**   Back home got in Thursday around 5pm

**Individual-1:**   Oh hell you n the gang get into any fights up there

**Jackson:** A couple[;] chased a few niggers off to on the streets too bitches talking shit then catch that pussy and run aint nothing but niggers there even all the cops are black fucking crazy I will never take my ass back to DC!!!!

On January 27, 2021, he admitted deleting one of his Facebook accounts because it contained pictures from his participation in the riot.   He stated, "I took my other fb page down because of my trip to Dec on 6th posted a bunch pics I shouldn't have."

### III.     THE CHARGES AND PLEA AGREEMENT

On July 13, 2022, a grand jury returned a Superseding Indictment charging Jackson with six counts, including Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §111(a)(1) and (b) (Count Two).   (ECF No. 14)   On February 28, 2024, Jackson pleaded guilty to a felony violation of 18 U.S.C. §111(a)(1), a lesser offense of Count Two, pursuant to a written plea agreement.   (ECF No. 76)

### IV.     STATUTORY PENALTIES

Jackson now faces sentencing on one Count of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. §111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49

(2007).  As the parties agreed in the Plea Agreement, and as the Probation Office also agrees, the Guidelines analysis for this matter is as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2(a)) | 14 |
| Use of Dangerous Weapon (U.S.S.G. § 2A2.2(b)(2)(B)) (shield) | + 4 |
| Official Victim (U.S.S.G. § 3A1.2(b)) | + 6 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | - 3 |
| **Total Adjusted Offense Level:** | **21** |

*See* Plea Agreement at ¶ 4(A).

The U.S. Probation Officer calculated Jackson's criminal history as Category III, which the parties do not dispute.[16]  Accordingly, based on both the Probation Officer's and the parties' plea agreement, Jackson's advisory Guidelines imprisonment range is 46 to 57 months' imprisonment.

Despite having agreed to the estimated Guidelines calculation set forth in the Plea Agreement (ECF 74 at ¶ 4) and having promised to make that recommendation to this Court, Jackson filed objections challenging three critical aspects of the calculation.  (ECF No. 92.)  He disputed the previously-agreed-upon Base Offense Level (which the parties agreed was 14) and application of the enhancements for both the Use of a Dangerous Weapon (+4) and Official Victim (+6).  Only after the undersigned notified Jackson's attorney that the objections were in breach of the plea agreement and offered counsel an opportunity to cure the breach by withdrawing the objections did counsel take half-hearted measures to withdraw them.   (ECF No. 95)

It remains a matter of concern however, that, in the Objections and in Jackson's recent withdrawal of the Objections in which he maintains the same factual position, Jackson makes several

---

[16]  In the Plea Agreement, the United States estimated that Jackson's Criminal History Category was IV, but noted that, after the Probation Officer's pre-sentence investigation, a different conclusion might be reached.  (ECF No. 76, at 4)   The Probation Officer now estimates that the defendant is a Category III offender based on 6 criminal history points.  (Final P.S.R. at ¶ 64)

inaccurate statements regarding his offense conduct, all of which are inconsistent with acceptance of responsibility.   For example, on page 3 of the Objections, Jackson claims he "did not act with the intent to make physical contact" with the officers.   But in the Statement of Offense that Jackson signed along with his plea agreement, and adopted before this Court, he acknowledged that he threw a flagpole "at the officers in the tunnel."   (ECF No. 77 at ¶ 15).   It is inconsistent – if not nonsensical - to suggest that, despite throwing the flagpole "at" the officers, Jackson did not intend for the flagpole to hit any of the officers.   It is reasonable to infer that Jackson intended the natural consequences of his deliberate act.   He knew exactly what he was doing, and he was looking right at the officers when he threw the flagpole.   Similarly, on pages 6-7 of the Objections, Jackson claims that "[n]o facts state that Mr. Jackson intended to or did hit a single officer with the flagpole."   For the same reason, this claim is inconsistent with Jackson's Statement of Offense.   In addition, Jackson argued that "[n]o facts show intent to cause serious bodily injury or harm."   While it may be that the evidence does not show an intent to cause "serious bodily injury,"[17] it is clear that Jackson's act of throwing a deadly and dangerous weapon into a group of besieged officers could only be done with an intent to harm the officers.   Furthermore, the facts show that Jackson was proud of his actions when he "fought those hoe ass traitor cops."   (ECF No. 77 at ¶ 16).

These representations about the nature of Jackson's conduct are inconsistent with his acceptance of responsibility.   Under the terms of the plea agreement, to be eligible for a reduction under U.S.S.G. § 3E1.1, Jackson must "clearly demonstrate acceptance of responsibility, to the

---

[17] It should be noted that it is not necessary for the government to prove, for either the charge or the "dangerous weapon" enhancement that Jackson intended to cause bodily injury – much less serious bodily injury - to a particular officer, or to the officers, generally.   Rather, it is enough that he intended to do the act of throwing the flagpole like a spear at the officers, and that such an object was capable of causing serious bodily injury in the way Jackson used it.   If the flagpole had struck an officer in the face or head or neck, such an injury could have occurred.   Jackson admitted as much when he acknowledged that the 4-level enhancement for use of a deadly or dangerous weapon applies under U.S.S.G. § 2A2.2(b)(2)(B).

satisfaction of the Government, through [his] allocution, adherence to every provision of this agreement, and conduct between entry of the plea and imposition of the sentence." (ECF No. 76 at p.3, ¶ 4(A)). Accordingly, at sentencing, should the defendant continue to deny responsibility for the offense and insist that the facts set forth in the Statement of Offense and agreed at the change of plea hearing are incorrect, the government reserves the right to seek denial of the adjustment for acceptance of responsibility.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration of at least 52 months.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Jackson's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, thwarting the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Jackson attacked police officers who were trying to defend the Capitol building from an angry, violent mob. He contributed to some of the worst violence of the riot at a location where many officers suffered injuries during hours of conflict resembling a medieval melee. Jackson did not just suddenly find himself in the middle of a riot—he chose to join it after it had begun, and with knowledge that it had become violent. Instead of shying away from the violence, Jackson inserted himself into the fray. He was front-and-center on the steps leading to Lower West Terrace tunnel, vehemently challenging and antagonizing officers who had assumed a purely defensive posture and were simply doing their duty. But Jackson's conduct went beyond mere verbal abuse and overt hostility. He joined many other rioters at that location who were violently assaulting the officers in an effort to get them to yield. The officers in tunnel were simply doing their duty, and their posture was purely defensive. Jackson threw a makeshift spear at them in a

manner that could have caused serious injury, had it struck one of them in the face or head or neck. In doing so, he made it harder for them to defend themselves against other rioter attacks.   The nature and circumstances of Jackson's offense were serious, and fully support the government's recommended sentence of 52 months.

### B.  The History and Characteristics of the Defendant

Brian Jackson has a dismal criminal record stretching back more than 30 years and involving frequent efforts to intimidate and hurt people.   His prior convictions include the offenses of Terroristic Threat, Deadly Conduct, Burglary of a Habitation with Intent to Commit Assault, Aggravated Robbery, and Resisting Arrest.

It should be noted that Jackson received only 1 criminal history point for his Aggravated Robbery offense (in which he used a deadly weapon), instead of 3 points, due to the application of a technical rule for the counting of points.   (P.S.R. at ¶ 62 and p. 32)   Therefore, his criminal history score under-represents his actual criminal history.

Furthermore, in light of the nature of the instant offense, it is worth noting he also has at least two other arrests for Terroristic Threat and Assault that Causes Bodily Injury that did not result in convictions.   It appears that the conduct in which he engaged on January 6th was one episode of a long and consistent history of violence.   Despite having had the advantages of a stable upbringing, present parents with whom he remains close, and a great childhood (P.S.R. at ¶ 78), Jackson chose a bad path and never veered off.

It should also be noted that, in contrast with Adam, the extraordinary impact of incarceration on family and family businesses is not a factor in the determination of an appropriate sentence in this case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports the recommended

sentence.   Jackson's assaultive conduct on January 6 was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[18]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a sentence of 52 months of incarceration.

While Jackson has accepted responsibility by pleading guilty–albeit 20 months after indictment, unlike Adam, he has never expressed any remorse.[19]   On the contrary, judging from statements he later made on social media, Jackson seems to have thoroughly enjoyed the experience of participating in the riot and was proud of having done so.   Immediately after the riot, Jackson was proud of his conduct, especially his violence, and he accused the police of being "traitors."   Even now, despite having admitted to committing a felony, Jackson wants people to believe he is a political prisoner.   He is a regular contributor to the vigils at the jail in which Jan. 6 defendants cultivate sympathy and solidarity for their alleged plight.   The GiveSendGo site created by his

---

[18] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

[19] Any last-minute expressions of remorse should be viewed with skepticism, particularly in light of his recent Objections calling his conduct and even the validity of his conviction into question.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home.   It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

fiancée for his benefit, Tamara Perryman, declares,

> On June 7th 2022, the federal government kidnapped my husband Brian Jackson because he went to our Nation's Capitol on Jan 6th 2021.   He didn't enter any buildings or assault any officer's however he is being persecuted as if he is a terrorist for being there . . .

These blatantly false representations have yielded over $5,000 in donations for Jackson.

It appears from his criminal history that he has been incarcerated 10 different times. Jackson's prior contacts with the criminal justice system did not deter him from engaging in violence on January 6th.

There are other factors that suggest Jackson is at high risk to engage in future violence. Jackson has long associated himself with white supremacism.   It cannot be disputed that racial animus is motivation for violence.   It may be noted that Jackson has a tattoo of Adolph Hitler's signature on the back of his neck and a tattoo of a swastika on one of his calves.   He also has a "KffK"[20] tattoo on his back suggesting membership in a violent motorcycle gang called the Kingsmen Motorcycle Club.   (P.S.R. at ¶ 84)   Finally, his initial bond report from the Southern District of Texas, noted prior membership in the White Knights prison gang.   Membership in groups that are known to view other races as inferior increases the risk of further violence and the need for deterrence.

Because of Jackson's utter lack of remorse and other factors, he poses a significant risk of future political violence.   A significant sentence is necessary to deter him from engaging in such conduct in the future.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community

---

[20]  The letters stand for "Kingsmen forever, forever Kingsmen."

over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and

weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[21]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[22] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentence in the following case provides a suitable comparison to the relevant sentencing considerations in this case.

In *United States v. James Elliott,* Case No. 23-cr-185 (RCL), Elliott pled guilty to a violation of 18 U.S.C. § 111(a)(1). Elliott, a member of the Proud Boys, brought with him to the Capitol a flag with a wooden pole, among other accoutrements. On the West Plaza, he encouraged other rioters with Game of Thrones battle cries. While officers and rioters were in a tug-o-war for control of a bike rack barrier, he swung his flagpole, striking one officer in the head. He followed that up

---

[21] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[22] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

by thrusting the flagpole toward the officer's face.   He later boasted about his actions in text messages.   Elliott received a sentence of 37 months.   Unlike Jackson, he was a Criminal History Category I offender with no record.   He also expressed remorse.

In *United States v. Raymond Cholod,* Case No. 23-cr-185 (APM), Cholod worked his way into the Lower West Terrace tunnel.   In the tightly packed space, he pushed his arm and elbow into an officer's face, pushed against a riot shield, and then tried to wrest that shied away.   Later in the day, while positioned on the steps leading to the tunnel, he picked up a long, solid stick and threw it toward the officers, into the tunnel.   A Criminal History Category I offender with no record, Cholod received a sentence of 40 months.

In *United States v. Matthew Miller,* Case No. 21-cr-75 (RDM), Miller pled guilty to violations of 18 U.S.C. §§ 1512(c)(2) and 111(a)(1).   Standing on a wall, Miller enthusiastically encouraged the mob to move closer to the Capitol building.   He then threw a full beer can in the direction of law enforcement (but did not hit anyone).   Later, near the Lower West Terrace tunnel entrance, he again urged the crowd forward and tried to synchronize the heave-ho efforts of other rioters.   Then he threw a bunch of batteries into the tunnel.   Finally, he sprayed a fire extinguisher at them, covering them with fog.   He received a sentence of 33 months.   However, unlike Jackson, he was a Criminal History Category I offender with no prior criminal convictions.   Also, unlike Jackson, he expressed remorse.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under

the VWPA).[23]   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."   *See* 18 U.S.C. § 3663(a)(3).   *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Jackson must pay $2,000 in restitution, which reflects in part the role Jackson played in the riot on January 6.[24]   Plea Agreement at ¶ 11.   As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July, 2023.   *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.)   Jackson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.   P.S.R. at ¶ 137.

## VIII.   FINE

Jackson's conviction for a violation of 18 U.S.C. §111(a)(1) subjects him to a statutory

---

[23] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[24] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

maximum fine of $250,000.   *See* 18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources.   *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.   U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine.   § 5E1.2(a), (e).   The Guidelines fine range here is $15,000 to $150,000 U.S.S.G. § 5E1.2(c).

A fine is appropriate in this case.   As the revised PSR notes, and looking most recently at his GiveSendGo page, Jackson has raised over $5,000 in an online campaign created by his fiancée. P.S.R. at ¶ 109.   The request for donations references Jackson's participation in the events of January 6th and his allegedly unjust detention.   Jackson is represented by two attorneys and has no legal fees associated with his case.   He should not be able to use his own notoriety gained in the commission of his crimes to "capitalize" on his participation in the Capitol breach in this way.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 52 months of imprisonment, 36 months of supervised release, $2,000 in restitution, a fine, and the mandatory special assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:      */s/   David J. Perri*
         DAVID J. PERRI
         WV Bar No. 9219
         Assistant United States Attorney (Detailed)
         United States Attorney's Office